STEVEN R. SHELDON AND ELLEN G. SHELDON,
PETITIONERS *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 18208-85.     Filed May 29, 1990.

*Vincent R. Barrella, Morton A. Smith, Alice Yaker,* and *Steven D. Goldberg,* for the petitioners.

*Edward J. Roepsch* and *James Hardaker,* for the respondent.

GERBER, *Judge:* Respondent determined a deficiency in petitioners' Federal income tax in the amount of $56,133 and liability for the increased rate of interest under section 6621(c)[1] for taxable year 1981. In an amended answer, respondent also asserted that petitioners are liable for the section 6653(a)(1) and (2) additions to tax for negligence or intentional disregard of rules and regulations. The issues for our consideration are (1) whether purchases of U.S. Treasury Bills financed by repurchase agreements were ficti-

---

[1]All section references are to the Internal Revenue Code of 1954 as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Subsec. (d) of sec. 6621 was redesignated subsec. (c) and amended by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1151(c)(1)(A)-(C), 100 Stat. 2744. We use the reference to sec. 6621 as redesignated and amended.

tious, (2) whether the transactions lacked economic substance, (3) whether the transactions should be characterized for Federal income tax purposes as forward contracts for purchases at future dates, and (4) whether petitioners are liable for the section 6653(a)(1) and (2) additions to tax and the section 6621(c) increased rate of interest because of those transactions.

## FINDINGS OF FACT

The parties have entered into a stipulation of facts, along with attached exhibits, all of which are incorporated herein by this reference.

Petitioners resided in Englewood, New Jersey, when they filed their petition. On May 6, 1981, Government Securities Dealers II (GSDII) was formed as a limited partnership under New York law. At all relevant times, the general partners of GSDII were Joseph Blumstein and petitioner Steven Sheldon (petitioner Ellen G. Sheldon is a petitioner due to her filing a joint Federal income tax return with her husband for 1981).

According to its limited partnership agreement, GSDII was formed "to act as a broker, dealer and market maker in United States Government securities, * * * [in] other interest bearing and interest oriented instruments and in metals." Before forming GSDII, petitioner and Mr. Blumstein each had several years of experience in the trading and selling of U.S. Government securities and other financial investments.

The general partners of GSDII, petitioner and Mr. Blumstein, contributed initial partnership capital in the amounts of $26,000 and $34,000, respectively. GSDII's 28 limited partners collectively contributed initial capital in the total amount of $1,356,250. Besides the above-indicated initial cash contributions, each GSDII limited partner also agreed to be personally liable for recourse obligations of the partnership up to the amount of three times the initial cash contribution.

GSDII began general operations on November 24, 1981, and reported its income for Federal tax purposes using the accrual method of accounting and a calendar year end. For the 1981 taxable year, GSDII reported income and expenses on its U.S. Partnership Return of Income, as follows:

| | |
|---|---:|
| Interest income from securities purchased under agreement to resell ......................................... | $13,447 |
| Interest expense from securities sold under agreement to repurchase ........................................ | (5,675,708) |
| Trading gain from U.S. Treasury note.................... | 283 |
| Guaranteed payments to general partners ($40,000 each) .. | (80,000) |
| Other expenses ....................................... | (35,715) |
| Net loss............................................. | (5,777,693) |

On its 1982 partnership return, GSDII claimed an additional $3,776,829[2] as interest on the above-described 1981 repo transactions. Additionally, GSDII entered into similar repo transactions at the end of 1982 and claimed $5,490,533 of repo interest for its 1982 taxable year regarding T-Bills purchased late in 1982 and maturing in January 1983.

In the statutory notice of deficiency respondent increased petitioners' 1981 taxable income by $104,195, representing petitioner's share of GSDII's 1981 claimed $5,675,708 deduction for interest accrued under repurchase agreements involving U.S. Treasury Bills (T-Bills).

## *T-Bills*

T-Bills are short-term noninterest-bearing securities issued by the U.S. Government that mature no more than 1 year from the date of issue. T-Bills are not issued with stated coupon rates of interest; rather, they are issued in public auction at a discount from their face value at maturity. The difference between the discount price at which T-Bills are issued and their maturity or face value is, in effect, the interest on the debt obligation paid by the U.S. Government.

Since 1979, T-Bills have not been issued in physical or tangible form, but have existed intangibly (only in book-entry form) by means of computerized files maintained by the 12 Federal Reserve Banks (the Fed). The Fed's book-entry system is a securities safekeeping arrangement between the Fed and a relatively small and limited number of "depository institutions" which act as securities-safekeeping-account customers (book-entry DI's). Those customers repre-

[2]Respondent has rounded this amount to $3,776,829, whereas petitioners have rounded it to $3,776,828. Due to the relatively small difference, no attempt was made to reconcile it.

sent the primary or first level in a tiered system of markets and accounts involving Government securities. Book-entry DIs, in turn, maintain accounts for their customers (secondary customers), which include other depository institutions which do not have a book-entry (primary) securities account with the Fed. Many of those secondary customers, in turn, may maintain accounts for their customers who may, in turn, maintain accounts for their customers, and so on.

"Book-entry securities" are transferred through the "Fedwire," a computer network which links the 12 Federal Reserve Banks and primary depository institutions. The Fedwire is used by these institutions to transfer both funds and book-entry securities to accounts of other primary institutions. A transfer of securities between customers of a single book-entry DI need not be reflected on the Fedwire; and may only be reflected in the records of the book-entry DI and its customer. Similarly, transactions at or below the secondary level, such as a dealer's retaining securities after a sale of such securities that is concurrent with an agreement to repurchase similar securities from the buyer at a later date, may result in entries in the secondary dealer's and its customer's records and no entry may be made in the records of a book-entry DI or the Fed. Transactions, such as the example described above, when cleared outside of the Fedwire, are referred to as "pairoffs." It is termed a "pairoff" because a primary or secondary entity clears the transactions by matching or pairing offsetting transactions together with a resulting entry on its record for the customer of any net difference between the transactions. Clearing trades by pairoff at the lowest level may save time and clearing costs and it is not unusual for dealers to settle offsetting trades by pairoffs and "difference checks." Of course, pairoffs and difference checks may not be used if the parties to the particular transaction are unwilling to use that method.

When a T-Bill matures, the Fed pays the face amount of the T-Bill to the book-entry DI who is listed in the Fed's book-entry accounts as the owner. It is then the responsibility of the book-entry DI to reflect the Fed's payment in its account for the customer and the customer is responsible

for crediting the account for its customer, and so on, if the T-Bill was sold to a lower-tier entity(ies).

*Repurchase Agreements*

The essence of the transactions in issue, from an economic perspective, is that GSDII "purchased" T-Bills and financed its T-Bill purchases by using T-Bill repurchase agreements (repos), which served the function of short-term loans collateralized by the purchased T-Bills. In all but one of the transactions, GSDII's repos were opposite (entered into with) the same contra-party (the dealer on the other side of the transaction) from whom GSDII bought the T-Bills.

Although people[3] in the repo market generally view repos as financing transactions or loans, in form a repo consists of two distinct transactions between two parties, who might be referred to as a "borrower" (GSDII in the transactions in issue) and a "lender" (GSDII's contra-parties). The two parts of a T-Bill repo are: (1) The borrower sells to the lender T-Bills at a specified price, with immediate payment and delivery; and (2) the borrower agrees to buy from the lender identical T-Bills at the same price plus interest thereon (repo interest), with payment and delivery either upon demand (an open repo) or at a specified future date. The rate of interest to be paid on the repo at maturity is not based on the yield of the underlying T-Bill, but upon the prevailing market rates for debt transactions of similar duration and risk. For more in-depth discussions of repo transactions, see *Securities & Exchange Commission v. Miller,* 495 F. Supp. 465, 466-473 (S.D.N.Y. 1980), and *In re Bevill, Bresler & Schulman Asset Management Corp.,* 67 Bankr. 557, 566-571 (D.N.J. 1986).

The market value of the securities used in a repo typically will be slightly in excess of the specified price at which the

[3]Commercial banks use repos to temporarily finance some or all of the Government securities in their portfolio. By using a repo, the bank can "sell" the security with an agreement to repurchase in order to temporarily convert securities to cash. The cash may be used for investments, obligations, etc. Dealers in Government securities may also hold an inventory of Government securities, which unlike a commercial bank, may be financed through repos arranged with the dealer's customers, nonfinancial corporations, State and local governments, and others. The repo arrangements in these instances provide an opportunity for the dealer's customers and others to earn short-term interest on cash, which otherwise would not draw interest. This form of transaction is considered relatively safe because the underlying security is an obligation of the U.S. Government.

borrower sells the securities to the lender. This excess of value over price is known as the "margin" or "haircut" and provides the lender a measure of protection against decline in the value of the underlying securities. There is no standard haircut used in repos; rather, the amount of the haircut varies, depending upon, inter alia:

—the borrower and its creditworthiness;
—the type of securities used as collateral and the creditworthiness of the issuer of those securities; and
—the length of time until the underlying securities mature and the volatility of the market for those securities.

In the marketplace the terms "repo" and "reverse repo" describe the same transaction viewed from opposite perspectives. A party engaging in a repo is, of necessity, opposite a party engaging in a reverse repo on the same transaction.

*Transactions in Issue*

The 11 transactions in issue for the 1981 taxable year are similar and a review of the specific terms of one such transaction will assist in understanding all of them. The only documents providing the specific terms for the transactions in issue are the trade confirmations and trade tickets used by GSDII and its contra-parties, but that is consistent with market practice during the early 1980's. At that time, parties generally entered into repos only on the basis of oral agreements with follow-up written confirmations from contra-parties. Subsequent to the taxable year in issue, parties to repo transactions commonly began using formal written agreements to memorialize the terms of their transactions.

The transaction between GSDII and Jesup & Lamont Holding Co. (J&L) was a representative transaction. GSDII purchased T-Bills maturing 1/14/82 in the principal amount of $60 million in a transaction having a "trade date" of Friday, November 27, 1981, and a "settlement date" of Monday, November 30, 1981. (Parties in the repo market treat the settlement date as the effective date of a T-Bill purchase or repo. For purposes of this opinion we shall treat the settlement date as the effective date.) GSDII's purchase

price for the $60 million of T-Bills was $59.244 million. The discount below par value of $756,000 correlates to a yield to maturity on the T-Bills of approximately 10.21 percent (based on 45 days from settlement (11/30/81) to maturity (1/14/82) and a 360-day year). To settle the $59.244 million purchase from J&L, GSDII paid a net amount of $6,000 by check dated November 30, 1981, and, on that same date, entered into a repo with J&L for the balance of the purchase price—$59.238 million.

The terms of the repo were 14 days, 10.50 percent, and a principal amount (purchase price) of $59.238 million. In other words, GSDII on the settlement date (11/30/81) sold to J&L $60 million of 1/14/82 T-Bills at a purchase price of $59.238 million, promising to buy from J&L $60 million of 1/14/82 T-Bills 14 days later at a price of $59.238 million plus interest at a rate of 10.50 percent.

In essence, GSDII simultaneously "purchased" $60 million of T-Bills from J&L and simultaneously financed the purchase of the T-Bills by entering into a repo with J&L. Under the repo, GSDII "sells" the same $60 million of T-Bills back to J&L in exchange for the "cash" to buy the T-Bills from J&L. As part of the repo, GSDII agrees to repurchase the same or similar T-Bills from J&L.

No cash changed hands and no interest was paid at the maturation of the 14-day repo on December 14, 1981; instead, the maturing 14-day repo was replaced by a 31-day repo. The 31-day repo was structured like the 14-day repo, but its specific terms were $59.238 million principal amount at a rate of 10.18 percent for 31 days. Thirty-one days was the time remaining from the date of the second repo (12/14/81) until the underlying $60 million of T-Bills matured (1/14/82). Thus, this 31-day repo is referred to as a "repo to maturity." On December 14, 1981, the results of GSDII's T-Bill purchase/repos with J&L were known, barring a failure by either GSDII or J&L to perform its contractual obligations. J&L and GSDII were only exposed to each other's credit risk and no market risk existed on the transaction after December 14, 1981. At the 1982 T-Bills maturity date and conclusion of the repo agreement, GSDII was entitled to $756,000 (the discount on its T-Bill

purchase), and J&L was entitled to interest on the two repos, calculated as follows:

$59.238 million $\times$ 10.50% $\times$ 14/360 =      $241,888.50
$59.238 million $\times$ 10.18% $\times$ 31/360 =      519,286.89
                                                     761,175.39

Thus, the net of the transaction was:

GSDII owed J&L...................................... $761,175.39
GSDII was due....................................... (756,000.00)
GSDII's loss ........................................ (5,175.39)

Since GSDII initially paid J&L $6,000 in cash and GSDII's net loss on the transaction was only $5,175.39, J&L issued a check in the amount of the difference ($824.61) to GSDII, closing out the transaction. That check was issued on January 14, 1982, the maturity date of the T-Bills and the second repo. On its Federal income tax returns, GSDII reported the $761,175 interest expense from the two repos partly on its 1981 return ($543,410) and partly on its 1982 return ($217,765)—allocating the expense between the years in accordance with an apportioned accrual of interest on the repos. GSDII reported the $756,000 T-Bill discount entirely on its 1982 tax return as interest income. If the income and expense of this transaction were both reported in the same taxable period GSDII would only be entitled to a net loss in the amount of $5,175.39. The tax benefit of the transaction lies in the mismatching of income and expenses. The mismatching also permits a taxpayer to defer the reporting of other unrelated income from one taxable year to another.

GSDII would have profited from the transaction if the interest that it owed J&L under the repos had been less than the discount on the purchased T-Bills. The transaction, as structured, however, locked in a loss as of December 14, 1981. The weighted-average interest rate GSDII owed J&L under the repos was approximately 10.28 percent (10.50 $\times$ 14/45 + 10.18 $\times$ 31/45). The $756,000 discount on GSDII's T-Bill purchase, however, translated into a yield to maturity on the $59.244 million purchase price of 10.2086 percent. For GSDII to have profited on this transaction, the weighted-average repo interest rate had to be lower than 10.2097 percent.[4] Accordingly, the transaction resulted in a

---

[4]Break-even interest amount ($756,000) $\div$ by principal ($59.238 million) $\times$ 360 days/45 days.

loss for GSDII because the average interest rate under the repos was approximately 10.28 percent, instead of lower than the break-even average rate of approximately 10.21 percent.

As demonstrated by the foregoing calculations, small changes in interest rates can cause a transaction to be profitable or unprofitable. This representative transaction also demonstrates that net profit or loss from a transaction ($5,175 in this example) is small compared to the par amount of the T-Bills involved ($60 million) and to the $761,175 interest expense claimed and $756,000 interest income eventually reported.

Ten of the 11 transactions in issue, including the J&L transaction, each: (1) Involved the purchase of T-Bills in late 1981 (between November 30 and December 18) simultaneous with the entry into a repo for T-Bills of the same par amount; (2) involved T-Bills maturing in January 1982; (3) involved an up-front cash payment by GSDII ($6,000 in the example) equal to the difference between the price of the T-Bills purchased ($59.244 million) and the principal price of the repo ($59.238 million), i.e., the so-called "haircut"; (4) ended with a repo to maturity entered into during December 1981; and (5) showed a net loss for GSDII because the average interest rate under the repos was between 0.02 percent and 0.10 percent higher than the yield to maturity on the T-Bills. In addition, none of the transactions was cleared over the Fedwire; all were cleared via pairoff, with no actual delivery of T-Bills to GSDII or to the contra-parties pursuant to the repos. Four of the 10 transactions utilized a third, intermediary repo in addition to the initial repo and the repo to maturity, but those transactions were like the other 10 in all other respects.

The eleventh of the transactions in issue varied somewhat from the others. On December 16, 1981, GSDII purchased T-Bills with a par value of $10 million from New York Hanseatic (NYH). GSDII was to pay for the T-Bills on December 17, 1981, by entering into a 1-day repo with R.M. Hobson (HOB). On December 17, 1981, however, NYH failed to deliver the T-Bills to GSDII. GSDII, as a result, was unable to deliver the T-Bills to HOB, as required under the 1-day repo. The market refers to a party's failure to deliver

securities as a "fail." On December 18, 1981, GSDII paid HOB $3,367.73, which petitioners characterize as interest under the 1-day repo and respondent characterizes as a fee for GSDII's fail. Also on December 18, 1981, GSDII entered into a repo to maturity with NYH in order to finance the T-Bills purchase from them. The repo rate was 10.88 percent, while the T- Bills had a yield to maturity of 10.42 percent. GSDII also paid NYH $1,376.84, an amount equal to GSDII's net loss on the transaction (without regard to the amount paid to HOB). The net result of GSDII's transaction with NYH is calculated as follows:

| | |
|---|---|
| Interest on repo due to NYH | $101,710.17 |
| Discount on T-Bills purchased 12/17/81 | 100,333.33 |
| GSDII net loss | 1,376.84 |

GSDII dealt with six contra-parties on the transactions in issue: J&L, Stuart Bros. (STU), Newcomb Securities Corp. (NSC), Cowen & Co. (COW), NYH, and HOB. Balance sheets from certain of those entities show their total assets as of specific dates, as follows:

| Entity | Date | Total assets |
|---|---|---|
| NSC | Jan. 31, 1981 (audited) | $5,102,512 |
| NSC | Jan. 31, 1982 (audited) | 158,684,897 |
| J&L | May 31, 1981 (unaudited) | 22,720,406 |
| J&L | Sept. 24, 1982 (audited) | 84,941,000 |
| COW | June 26, 1981 (audited) | 214,246,255 |

The following chart summarizes the 11 transactions in issue, showing: GSDII's contra-party; par value of T-Bills purchased; yield to maturity of those T-Bills; number of days outstanding and interest rate of each repo relating to the purchased T-Bills; up-front cash payment by GSDII (which petitioners assert was a haircut); closing cash payment by or to GSDII; and GSDII's net loss on the transaction:

| | T-Bill purchase | | Repos | | Up-front | Closing | GSDII's |
|---|---|---|---|---|---|---|---|
| From | Par value (million) | Yield to maturity | No. of days | Rate | paid by GSDII + | paid by (to) GSDII = | net loss |
| J&L | $60 | 10.21 | 14 | 10.50 | $6,000.00 | - - - | - - - |
| | | | 31 | 10.18 | - - - | $(824.61) | $5,175.39 |
| J&L | ¹50 | 10.25 | 7 | 10.50 | 8,944.25 | - - - | - - - |
| | 25 | 10.27 | 45 | 10.30 | - - - | - - - | - - - |
| | 25 | 10.29 | - - - | - - - | - - - | (260.83) | 8,683.42 |
| STU | 70 | 10.47 | 1 | 11.00 | 3,889.20 | - - - | - - - |
| | | | 7 | 10.50 | - - - | - - - | - - - |
| | | | 50 | 10.53 | - - - | 2,774.42 | 6,663.62 |

| From | T-Bill purchase — Par value (million) | Yield to maturity | Repos — No. of days | Rate | Up-front paid by GSDII + | Closing paid by (to) GSDII = | GSDII's net loss |
|---|---|---|---|---|---|---|---|
| NSC | 85 | 10.53 | 7 | 10.875 | 6,611.30 | - - - | - - - |
|  |  |  | 36 | 10.55 | - - - | 533.45 | 7,144.75 |
| NSC | 75 | 10.46 | 1 | 11.375 | 7,500.00 | - - - | - - - |
|  |  |  | 7 | 10.60 | - - - | - - - | - - - |
|  |  |  | 28 | 10.48 | - - - | (2,386.89) | 5,113.11 |
| NSC | 80 | 10.65 | 4 | 11.375 | 6,266.40 | - - - | - - - |
|  |  |  | 7 | 10.75 | - - - | - - - | - - - |
|  |  |  | 38 | 10.64 | - - - | 454.98 | 6,721.38 |
| J&L | 80 | 10.57 | 3 | 11.50 | 4,888.80 | - - - | - - - |
|  |  |  | 14 | 10.75 | - - - | - - - | - - - |
|  |  |  | 38 | 10.50 | - - - | 1,079.21 | 5,968.01 |
| J&L | 75 | 10.44 | 7 | 11.00 | 5,916.75 | - - - | - - - |
|  |  |  | 37 | 10.40 | - - - | (1,115.89) | 4,800.86 |
| COW | 30 | 10.41 | 7 | 11.125 | 4,050.00 | [3] | - - - |
|  |  |  | 42 | [2]10.38 | - - - | (66.66) | 3,983.34 |
| NYH | 10 | 10.42 | 34 | 10.88 | 1,376.84 | - - - | 1,376.84 |
| HOB |  |  | 1 | 12.25 | - - - | 3,367.73 | 3,367.73 |
| J&L | 25 | 10.78 | 4 | 11.875 | 520.75 | [3] | - - - |
|  |  |  | 37 | 10.69 |  | 171.74 | 692.49 |
|  | 690 |  |  |  | 55,964.29 | 3,726.65 | 59,690.94 |

[1] On Nov. 30, 1981, GSDII made three separate purchases from J&L of 1/21/82 T-Bills in an aggregate par value of $100 million. GSDII also entered into repos with J&L for $100 million of 1/21/82 T-Bills on Nov. 30, 1981, and Dec. 7, 1981.

[2] Although the repo confirmations specify an interest rate of 10.40 percent, the parties later agreed on and computed the closing of the repo using a 10.38-percent rate.

[3] Cash paid upon closing the COW and J&L ($25 million) transactions differed from amounts owed according to trade tickets by 20¢ and 8¢, respectively.

All of the T-Bills purchased by GSDII were 26-week T-Bills issued during July 1981 and maturing on January 7, 14, 21, or 28, 1982. The par value of T-Bills purchased by GSDII in December 1981 compared with the total par value of all 26-week T-Bills issued by the Treasury Department and maturing on the same dates (according to the December 1981 Treasury Bulletin, p. 57) is as follows:

| Maturity date | Purchased by GSDII (millions) | T-Bills issued (millions) | GSDII percent of issued T-Bills |
|---|---|---|---|
| 1/ 7/82 | $75 | $4,042 | 1.9 |
| 1/14/82 | 145 | 4,062 | 3.6 |
| 1/21/82 | 265 | 4,053 | 6.5 |
| 1/28/82 | 205 | 4,349 | 4.7 |
| Total | 690 | 16,506 |  |

In the latter part of 1982, GSDII once again entered into transactions consisting of T-Bill purchases accompanied by repos, which we shall describe as the "82-83 transactions." (It should be noted that the 82-83 transactions are not in issue in this case.) Similar to the 1981-82 transactions, the 82-83 transactions involved purchases in 1 year (1982) of

of T-Bills maturing in January of the next year (1983), along with simultaneous entries into repos involving T-Bills of the same par value and maturity. The 82-83 transactions are summarized below (contra-parties are J&L; REFCO Interest Rate Associates (REF); Kiel, Baeder & Co. (KB); and World Trade Securities (WT)):

| | T-Bills | | Repos | | |
| | Par value (million) | Yield to maturity | No. of days | Rate | GSDII's net gain (loss) |
|---|---|---|---|---|---|
| REF | $35 | 9.15 | 14 | 9.00 | - - - |
| | | | 106 | 9.15 | $2,292.32 |
| J&L | 28 | 8.76 | 8 | 9.00 | - - - |
| | | | 97 | 8.75 | (802.10) |
| KB | 60 | 8.67 | 10 | 8.75 | - - - |
| WT | | | 97 | 8.65 | (1,731.52) |
| REF | 50 | 8.10 | 11 | 8.70 | - - - |
| | | | 80 | 7.90 | 13,168.53 |
| REF | 55 | 8.08 | 14 | 8.75 | - - - |
| | | | 59 | 7.92 | 157.32 |
| J&L | 65 | 8.53 | 21 | 8.75 | - - - |
| | | | 44 | 8.38 | 3,495.65 |
| REF | 55 | 8.43 | 10 | 8.50 | - - - |
| | | | 56 | 8.40 | 1,371.37 |
| REF | 12 | 8.02 | 14 | 8.50 | - - - |
| | 360 | | 30 | 7.75 | 429.04 |
| | | | | | 18,380.61 |

The 82-83 transactions, unlike the 1981-82 transactions, resulted in net gains for GSDII. On the average, the yields to maturity on the 82-83 T-Bills were .02 percent, or 2 basis points (a basis point is 1/100 of a percent), greater than the interest rates on the repos financing those T-Bills. The approximate weighted average rates[5] of the 82-83 transactions were 8.52 percent on the T-Bills and 8.50 percent on the repos. The approximate weighted-average rates for the 1981-82 transactions, however, were 10.46 percent on the T-Bills and 10.53 percent on the repos, or a negative spread of 7 basis points.

Price Waterhouse, GSDII's auditors, treated the transactions in issue normally[6] and without questioning their form. According to GSDII's audited income statements and the

[5]Weighted with respect to (1) number of days to maturity (for T-Bills) or outstanding (for repos) and (2) par value of the T-Bills involved.

[6]In a memorandum to its files dated Mar. 26, 1982, Price Waterhouse, GSDII's auditors, summarized the transactions in issue and their treatment on the 1981 financial statements as follows:

Price Waterhouse work papers, GSDII's income and expenses for financial statement purposes for the periods ending December 31, 1981 and 1982, were reflected as follows:

|  | 1981 | 1982 |
|---|---|---|
| Trading gains | - - - | $65,299 |
| Interest income: | | |
| T-Bills in issue | $5,613,629 | 3,779,217 |
| T-Bills: 82-83 transaction | - - - | 5,492,239 |
| Reverse repos | 13,447 | 2,834,689 |
| Miscellaneous | - - - | 5,191 |
| Investment account: gains/losses | - - - | 294,053 |
| Investment account: coupon interest | - - - | 435,668 |
|  | 5,627,076 | 12,841,057 |
| Interest expense: | | |
| Repos in issue | 5,675,708 | 3,776,828 |
| Repos: 82-83 transactions | - - - | 5,490,533 |
| Matched book repos | - - - | 2,708,977 |
| Other | - - - | 12,665 |
| Investment account interest | - - - | 727,045 |
|  | 5,675,708 | 12,716,048 |
| Net trading revenue (loss) | (48,632) | 190,308 |
| Less: General partners' salaries | 80,000 | 135,850 |
| Other expenses | 35,965 | 217,405 |
| Net loss | (164,597) | (162,947) |

As is apparent from the following schedule, GSDII's reporting of the 11 transactions in issue differed for tax purposes and accounting purposes only as to the timing of the interest income from the purchased T-Bills:

During the short period that GSDII traded, approximately 10 T-bill positions (averaging $70 million each) were opened and all were exposed to market risk (i.e., T-bill maturity date extended past the repo maturity date). [Price Waterhouse apparently did not consider the $10 million NYH/HOB transaction to be a T-bill position which was open and exposed to market risk.] In 9 out of the 10 positions GSDII was able to refinance the repos at rates below the original repo. In 6 of these they were able to refinance at more than 50 basis points (.5%) below such rates. * * *

The accounting for repurchase trans[ac]tions ([according to] the Proposed Audit Guide, Audits of Brokers and Dealers in Securities dated April 15, 1981) is to treat them as financing transactions and not as sales of trading or investment positions. GSDII is entitled to the interest earned on the T-Bills and must accrue interest expense on the repo financing.

When the repo is not to the maturity of the T-Bill, the interest earned is calculated by marking the T-Bill to market which accounts for the changes in interest rates. As of December 31, 1981, GSDII had eliminated its market risk by refinancing all such positions to maturity. Marking to market would not adequately reflect their financial position because repos cannot generally be closed out before maturity and therefore the risks associated with holding the T-Bills have no significance.

While the [Proposed Audit] guide does not specifically address the accounting for repos financed to the collaterals' maturity, a generally accepted practice in the industry is to record the asset (T-Bill) at cost plus accrued (accreted) interest and the liability (repo) at contract value (contract amount plus acc[ru]ed interest).

|  | Tax | Accounting |
|---|---|---|
| 1981 Income | - - - | $5,613,629 |
| 1981 Expense | 5,675,708 | 5,675,708 |
| 1981 Net income (loss) | (5,675,708) | (62,079) |
| 1982 Income | 9,392,846 | 3,779,217 |
| 1982 Expense | 3,776,828 | 3,776,828 |
| 1982 Net income (loss) | 5,616,018 | 2,389 |
| Actual net loss | (59,690) | (59,690) |

GSDII's $59,690 net loss from 1981 repo transactions may be more simply summarized, as follows:

| | | |
|---|---|---|
| T-Bills (face value) | $690,000,000 | |
| Less: Purchase price | 680,607,154 | |
| Discount | 9,392,846 | |
| Less: Repo interest claimed on partnership return for taxable year— | | |
| 1981 | $5,675,707 | |
| 1982 | 3,776,829 | 9,452,536 |
| Net loss from transaction | | (59,690) |

GSDII was the second in a series of limited partnerships formed by petitioner and Mr. Blumstein, all of which engaged in similar transactions involving interest-based investments. The first such partnership was Government Securities Dealers, later known as Government Securities Dealers I (GSDI)), which was organized in November 1980 and began business in December 1980. GSDII, as noted above, began operations on November 24, 1981. A third partnership, Government Securities Dealers III (GSDIII), commenced operations on November 16, 1982. In late 1983, a fourth such partnership, Government Securities Dealers IV (GSDIV) began operations. On March 1, 1984, the aforementioned partnerships all became partners in another newly-formed partnership, Government Securities Dealers (GSD). After GSD was formed, the type of business generally transacted through the other four partnerships was generally transacted through GSD. The partnership interests in GSD were as follows:

| | |
|---|---|
| GSDI | 19.870% |
| GSDII | 23.490 |
| GSDIII | 35.960 |
| GSDIV | 20.670 |
| Petitioner | .005 |
| Mr. Blumstein | .005 |
| Total | 100.000 |

OPINION

Although the concepts and transactions involved are somewhat esoteric and complex, the simple question here is whether the transactions resulted in an interest deduction for petitioner. If the transactions in issue had begun and been completed in the same taxable year, petitioner's claimed interest deduction would have been offset by a relatively equivalent amount of interest income. Only the net difference between the interest income and interest deduction would have been deductible from or includable in income. As the facts reveal, the net amount of interest (income or deduction) would be relatively insignificant in comparison to the amounts in controversy. For example, GSDII, for the 1981-82 transactions, claimed a $5,675,708 deduction for interest, whereas the net overall loss from the transaction (essentially from interest differential) was only $59,690. The tax benefit here is facilitated by the mismatching of "income" and "deductions," thereby permitting the offset and deferral[7] of current income to a future year.

Respondent advances three distinct arguments for disallowing GSDII's claimed 1981 interest deduction of $5,675,708. First, respondent contends that the T-Bill purchases and repos were fictitious, i.e., that GSDII and the contra-parties merely documented nonexistent transactions in order to substantiate the interest deduction. *Price v. Commissioner*, 88 T.C. 860 (1987). Second, respondent contends that the transactions, even if real, lacked tax-independent consequences or motives and, therefore, lacked economic substance. A transaction will be disregarded for Federal income tax purposes if it is either fictitious or lacking in economic substance.[8] *James v. Commissioner*, 87 T.C. 905, 918 (1986), affd. 899 F.2d 905 (10th Cir. 1990); *Goldstein v. Commissioner*, 364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965). Third, respondent contends that

---

[7]Petitioner, by claiming the interest deduction in 1981 (which was generated by a transaction structured late in 1981) and reporting the corresponding income in 1982 (which was structured to occur very early in 1982), does not have to report unrelated 1981 income which was offset by the interest deduction until Apr. 15, 1983. Accordingly, unrelated income received early in 1981 may not be taxed until more than 2 years after it was received.

[8]Although fictitious transactions or those lacking in economic substance have, in different cases, been alternately labeled as a "sham," in this opinion the term "fictitious" will refer to nonexistent transactions and transactions lacking economic substance will be so described.

GSDII's T-Bill purchases from the contra-parties, combined with repos involving T-Bills of the same par amount with the same contra-parties, constituted, in substance, forward contracts for the purchase of T-Bills at future dates by GSDII. If, with respect to any of the transactions, we decide either of respondent's first two positions in his favor, it will not be necessary to reach the third issue.

Respondent's notice of deficiency contained a deficiency determination based upon respondent's first two arguments, as follows: "The transactions at issue were either shams or devoid of the substance necessary for recognition for Federal income tax purposes." Consequently, petitioners bear the burden of proving that the challenged transactions (1) were real and (2) had economic substance. Rule 142(a); *Brown v. Commissioner*, 85 T.C. 968, 998 (1985), affd. sub nom. *Sochin v. Commissioner*, 843 F.2d 351 (9th Cir. 1988). On the other hand, respondent's notice of deficiency did not contain a reference to the third argument or theory. Accordingly, respondent bears the burden of proving that the transactions constituted forward contracts. Rule 142(a); *Achiro v. Commissioner*, 77 T.C. 881, 890 (1981).

### Fictitious or Real

We first address whether the transactions involving the purported T-Bill and repo transactions were fictitious or real. We conclude that petitioners have sustained their burden of proving that 10 of the 11 transactions in issue were real. Petitioners offered direct documentary evidence of the transactions (trade tickets and confirmations) and petitioner's testimony corroborated by the testimony of contra-party employees. One of petitioners' experts, Dr. David I. Meiselman, reported that the T-Bill purchases and repos were "executed * * * in accordance with accepted industry practice."

Respondent's expert, Steven Dym, opined that the failure to add accrued repo interest to the prices of the intermediate and subsequent repos indicates that the transactions

---

Moreover, if petitioner (through the next generation of "GSD entity") enters into similar sized transactions at the end of 1982 and subsequent years, the original unrelated gain may be rolled over many times and the deferral would continue, possibly unabated. As explained, *infra*, however, Congress enacted a provision which specifically prohibited the mismatching for 1984 and later taxable years.

were irregular. On that point, however, the evidence was conflicting. One of petitioners' experts, Dr. Marcia Stigum, testified that such practice was consistent with industry custom.

Respondent relies heavily upon *Price v. Commissioner,* 88 T.C. 860 (1987). In that case, we described the taxpayer's strategy as attempting "to defer the recognition of income (by generating paper losses) from an earlier year (year 1) to a later year (year 2) through the use of Treasury bill straddles while obtaining interest deductions through the use of repurchase agreements." *Price v. Commissioner,* 88 T.C at 882. In *Price,* we relied upon a combination of three factors in deciding that purported T-Bill purchases and repos were fictitious:

(1) The size of the transactions and the lack of an apparent ability of the dealers involved * * * to acquire, own, or possess the amount of the securities allegedly sold; (2) the prearranged nature of the transactions to provide a specified loss * * * ; and (3) the relatively small amount of margin deposits required in comparison to the magnitude of the alleged trades. * * * [88 T.C. at 884. Fn. ref. omitted.]

Although *Price* involved straddles in conjunction with repos and the tax benefits claimed were in the form of losses, rather than solely from interest as in this case, the cases are sufficiently similar to warrant a thorough evaluation.

*Size of the Transactions*—The record supports our finding that the size of the transactions or trades in issue was common in the 1981 T-Bill market. Additionally, on brief, respondent requested that we find that short maturity T-Bills, such as those in issue, were commonly traded in lots of $50 million to $100 million. One of petitioners' experts, Frank Pennisi, further confirmed the regularity of the size of the trades by indicating that it is insufficient profit for traders to deal in T-Bill repo transactions with face amounts of $10 million or less because the potential gain or loss is too small. Mr. Pennisi explained that a one-basis-point change in the interest rate on a T-Bill 45 days from maturity results in a change in profit of only $12.50 per million dollars of face amount.[9]

---

[9]$1 million × .0001 × 45/360 days. E.g., on a 45-day T-Bill, a change of 10 basis points in the interest rate (say from 10.50 percent to 10.60 percent), which would be greater than the

*Prearranged Nature of Transaction*—With respect to the apparent ability of the contra-parties to acquire the amounts of the T-Bills sold to GSDII, the balance sheets of the two major sellers of the T-Bills in issue (J&L and NSC), on their face, indicate that those respective dealers' total assets were substantially less than the face value of the T-Bills they sold to GSDII. J&L's total assets, as of dates a few months before and after the transactions in issue, approximated $23 million and $85 million, respectively, while J&L purported to sell GSDII $340 million of T-Bills in late 1981. Similarly, NSC's balance sheets, before and after the purchases in issue, reflect total assets of approximately $5 million and $159 million, respectively, at a time when NSC purportedly sold $240 million of T-Bills to GSDII. Approximately $148 million of the $159 million of total assets reflected on NSC's January 31, 1982, balance sheet consisted of securities purchased under repos, and approximately $149 million of $152 million of total liabilities involved securities purchased under repos.

These asset levels appear to indicate that J&L and NSC were not financially able to own the amounts of T- Bills that they supposedly sold to GSDII. Traders in the T-Bill market, however, are not required to possess assets or capital equal to the values of the T-Bills they purchase. Mr. Pennisi stated that "no [T-Bill] dealer, even the largest, is generally in a position to finance its own purchases of securities"; rather, traders rely on repos as a means of financing T-Bill acquisitions. Accordingly, the amount of assets reflected on NSC's and J&L's balance sheets is of less significance in the setting of this case. Considering that T-Bills could be purchased by using repos and paying little or no margin, we find that GSDII's contra-parties had the ability to acquire the T-Bills sold to GSDII in the transactions in issue.[10]

---

spread between the T-Bill yield and the average repo rate on 10 of the 11 transactions in issue and seven of the eight 82-83 transactions, would result in a net change in profit or loss on T-Bills with a par amount of $10 million of only $1,250 (10 [basis points] × $12.50 × 10 [million dollars par]).

[10]That is not to say, however, that any of the contra-parties or GSDII were in a position to "deliver" T-Bills at maturity. The unique circumstances of a repo transaction permit extremely leveraged margin positions in order for traders to attempt to gain from the relatively small amounts that may be generated from changes in interest rates. The relatively small potential gains cause investors to trade in large quantities. Although the parties to the transactions "own" the underlying T-Bill for purposes of the transaction, technically, they are

More significantly, this case is distinguishable from *Price,* at least with respect to 10 of the 11 transactions, due to the absence of any prearrangement of results between GSDII and the contra-parties. The prearranged transaction here concerns the T-Bill purchase from NYH and the repo to maturity used to finance that purchase. That transaction has a loss fixed for GSDII from the outset. The prearranged nature of the NYH transaction, however, is not evidence that the other 10 transactions were fictitious.

Respondent contends that the profit or loss on each transaction was prearranged when the parties first entered into the transactions. Respondent points out on brief that "There is no specific market information available on repo rates for the T-Bills used by the parties. The repo rate is negotiated for each transaction and depends upon the size of the transaction, the needs of the parties and the securities involved." The absence of evidence to corroborate the repo terms, similar to sales price corroboration of publicly traded shares of stock, leaves us without a standard against which the validity of the transactions' terms may be checked. The lack of independently reported trade information does not, by itself, show the transactions were prearranged. Although the transactions were not prearranged as between GSDII and contra-parties, the transactions were planned and arranged by GSDII to appear regular and, at least with respect to the 1981-82 transactions, to have a fixed loss in an amount approximating the up-front payments to contra-parties.

GSDII's profit or loss was subject to the risks of the repo market for the limited time from purchase until GSDII entered into repos to maturity. Any losses on those transactions were sustained because repo interest rates did not decline far enough after the initial entry into the transactions. Respondent's contentions that the transactions were prearranged and that the "net losses" actually were preset fees are not sufficiently supported in the record.

*Relative Size of Margin to Amount of Trades*—No industry standards or limitations existed regarding the amount

---

not being called upon to deliver unless they are involved in a repo to maturity with a third party. The essence of these transactions lies in the offsetting of the T-Bill against the obligation with a resultant gain or loss on the interest. The net difference in these transactions is infinitesimal in comparison to the market value of the underlying assets.

of margins on repo-financed T-Bill purchases. T-Bills were purchased with little or no margin paid. The up-front payments by GSDII were small in comparison to the par amounts of T-Bills purchased, ranging from approximately .002 percent to .0135 percent of the T-Bill par value. Similarly, the potential for profit or loss on leveraged T-Bill purchases is relatively small compared to the T-Bill values involved. The up-front payments GSDII made on the transactions were larger than the net losses incurred by GSDII in about half those transactions. This aspect raises some question about the transactions. The transactions may appear prearranged where the parties are able, with relatively finite accuracy, to estimate (at the front end of the transaction) the amounts necessary to close out the T-Bill transactions at the maturity. This factor does not automatically cause the transaction to be fictitious, but may have some bearing on the economic substance of the transactions. Although there are some aspects of these transactions which cast doubt on their regularity, we find that 10 of the 11 transactions were not fictitious.

Respondent also suggests that GSDII's failure to take delivery of any of the T-Bills in issue precludes a finding that GSDII ever acquired any T-Bills. Respondent argues, in essence, that the settling of the transactions by pair-offs, instead of by deliveries to and from GSDII, causes the transactions to be fictitious. Settlement by pair-offs does not automatically render the transactions fictitious. See *First National Bank of Las Vegas, New Mexico v. Estate of Russell,* 657 F.2d 668, 674 n. 18 (5th Cir. 1981). The use of a third party in repo transactions, may help ensure the genuineness of a transaction, but the lack of a third party does not conversely require a finding that a transaction is fictitious or illusory. As several of the witnesses noted, one of the obvious sources for T-Bill financing is the party selling the T-Bills. During 1981, seller financing of repos was not an unusual practice in that market.

The use of pair-offs in the setting of these particular transactions permitted GSDII to acquire and finance T-Bills without any potential for "delivery" by itself or the contra-party. Without the need for "delivery," the advance of a small amount of capital permits an appearance of

ownership of a substantial dollar amount of T-Bills for purposes of these transactions. The ownership of the T-Bills and the obligation under the repo are essential to the deductibility of the interest. Based upon the record in this case, petitioner has shown that transactions of the type under consideration were common during the period under examination. Although there is some legal uncertainty and factual doubt as to whether these transactions represent sales or secured collateralized loans, our ultimate holding (that the transactions lacked economic substance) obviates the need to decide that aspect.

Respondent, on brief,[11] argued that substantial evidence indicates that "no T-Bills existed." We have examined respondent's contentions with regard to whether the T-Bill and repo transactions were fictitious and find that petitioner has adequately shown that 10 of the 11 transactions were not fictitious. On the other hand, it is apparent that the transactions were, in many respects, preconceived by GSDII and, to some extent, contrived. It is clear that the repos were designed to be transacted near yearend to facilitate the interest deduction in the first year and the mismatched reporting of the related income in the next. Also, GSDII began operations at yearend (as did separately created "GSD entities" in other years) to focus their efforts upon obtaining tax benefits for partners in the form of interest deductions approximating about four times their yearend cash investment. Additionally, GSDII locked in losses and eliminated market risks with respect to the 1981 transactions, prior to the end of 1981. These factors are more appropriately discussed in the next subdivision concerning economic substance.

---

[11]Respondent's brief contained the following contentions:

1. The Petitioner in late November and on Dec. 1 and 2, 1981, agreed to purchase $470 million (face value) of T-Bills from Jesup, Stuart Brothers & Newcomb before GSD II opened a clearing account to receive delivery of the alleged T-Bills.

2. No T-Bills were delivered to or from GSD II's clearing account at SP after it was opened on Dec. 3, 1981, for the disputed T-Bill transactions.

3. Only GSD II and the contra dealers were involved in the disputed two-party T-Bill transactions.

4. The contra dealers did not acquire, purchase, borrow, or own any T-Bills for the disputed T-Bill transactions.

5. The contra dealers did not hold T-Bills for the benefit of GSD II in connection with the disputed T-Bill transactions.

6. GSD II did not acquire, purchase, borrow, or own any T-Bills for the disputed T-Bill transactions.

*Economic Substance*

In general, a transaction has economic substance and therefore will be respected for Federal income tax purposes if it is "imbued with tax-independent considerations." *Frank Lyon Co. v. United States,* 435 U.S. 561, 572 (1978); *Hulter v. Commissioner,* 91 T.C. 371, 388 (1988). Similarly, loans or other financing transactions will merit respect and give rise to deductible interest only if there is some tax-independent purpose for the transactions.

All but one of the 11 T-Bill purchases involved two or three repos each, i.e., a purchase was accompanied by an initial financing transaction and then followed by one or two refinancing transactions resulting in a final refinancing to the maturity of the T-Bill.[12] At the termination of each initial repo, with the exception of the "NYH transaction," GSDII became entitled to T-Bills and, also, obligated to pay the respective contra-party the repo price plus interest. In all such instances, GSDII did not receive T-Bills or pay the respective contra-party the repo price plus interest. Instead, GSDII entered into new repos involving the same T-Bills, but for different durations and at different interest rates. Each of the repos subsequent to the initial repos involved a separate negotiation of term and rate. Although there were 11 separate transactions involved, they all have similar characteristics and together present a pattern of conduct on behalf of GSDII. Accordingly, we will examine the repos separately and in conjunction with each other in order to analyze whether any or all of the transactions had economic substance. In some cases where transactions are analyzed regarding their economic substance, the focus is upon profit objective or the potential for profit. See, e.g., *Levy v. Commissioner,* 91 T.C. 838, 854 (1988), involving a sale and

---

7. GSD II did not hold T-Bills for the benefit of the contra dealers in connection with the disputed T-Bill transactions.

8. There was no need for the T-Bills to be owned by GSD II or the contra dealers for the disputed two party "mirror image" T-Bill transactions. The agreements to purchase and sell T-Bills under GSD II's repos were "paired off" (offset) on the cash settlement dates without delivery of any T-Bills.

9. GSD II did not acquire a present interest in the ownership of the disputed T-Bills on the initial cash settlement dates.

10. On the maturity dates of the T-Bills, the Federal Reserve, as fiscal agent of the Treasury, did not pay GSD II or the contra dealers the $690 million (face value) for the disputed T-Bills.

[12]The purchase from NYH involved a single repo to maturity.

leaseback transaction. Where a taxpayer's claimed deduction concerns an interest expense, the need for a profit objective may be of little or insignificant importance. Section 163, as in effect for the 1981 taxable year, "allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." Unlike sections 162 and 165 which, at least to some extent, require that claimed deductions or losses be incurred in a trade or business, section 163 does not contain that specific requirement.

Interest, however, is not deductible if the underlying transaction is a sham. *Price v. Commissioner*, 88 T.C. 860 (1987); see also *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983) (affirmed with respect to interest claimed on nonrecourse debt but reversed with respect to interest actually paid on recourse debt). Nor is interest deductible if it is incurred in a transaction "that can not with reason be said to have purpose, substance, or utility apart from their anticipated tax consequences." *Goldstein v. Commissioner*, 364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965); *Knetsch v. United States*, 364 U.S. 361 (1960).

Having found that 10 of the 11 repos and related transactions were not fictitious, we must now consider whether, within the meaning of *Goldstein*, any of the transactions had economic substance. *Goldstein*[13] has sufficient similarity to this case to warrant an in-depth analysis. The Court of Appeals for the Second Circuit, in affirming our opinion, found that the transactions were not fictitious, but that they lacked economic substance.

*Goldstein* involved a 70-year-old woman who won the Irish Sweepstakes. Her son, an accountant, formulated a plan to use section 163 to obtain interest deductions to reduce his mother's tax burden on her sweepstakes winnings. The plan was to purchase relatively large amounts of Treasury notes bearing 1½-percent interest by means of funds borrowed at 4 percent. The 4-percent interest on the borrowed funds was to be prepaid and deducted in the

---

[13]The vitality of *Goldstein v. Commissioner*, 364 F.2d 734 (2d Cir. 1966), affg. 44 T.C. 284 (1965), although nearly 25 years old, is undiminished. See, for example, *Julien v. Commissioner*, 82 T.C. 492, 509 (1984), where we disallowed the deduction of interest paid on a debt incurred in connection with a commodity straddle which had been arranged to produce a fixed loss.

taxable year of the sweepstakes winnings. The loans were secured by the Treasury notes and it was contemplated that the overall transactions would result in economic losses, but that the net result would be tax benefits.

In our *Goldstein* opinion we disallowed the deduction of interest using the following language:

In the instant case, * * * we have concluded that this case is indistinguishable *on principle* from the above-cited *Knetsch* and *Bridges* cases; and that (to adopt the words of the Fourth Circuit) "the principles * * * laid down by the Supreme Court [in the *Knetsch* case] are not only applicable, but controlling, in the determination of the instant case." We have further concluded and have heretofore found as an ultimate fact, that (as we said in the *Bridges* case), "As payments of interest, the transactions [with the banks here involved] were shams." [*Goldstein v. Commissioner,* 44 T.C. at 298.]

In affirming our *Goldstein* opinion, the Court of Appeals for the Second Circuit noted that the affirmance was only on one of the two grounds described in our opinion. The Circuit Court stated that "In large part [the Tax Court's] holding rested on [its] conclusion that both loan transactions were 'shams' that created 'no genuine indebtedness.' " *Goldstein v. Commissioner,* 364 F.2d at 737. The Circuit Court, agreeing with the dissent from our *Goldstein* opinion, held that the loan transactions were "regular and * * * indistinguishable from any other legitimate loan transaction contracted for the purchase of Government securities." *Goldstein v. Commissioner,* 364 F.2d at 737.

The Circuit Court went on to hold that section 163 "does not permit a deduction for interest paid or accrued in loan arrangements * * * that can not with reason be said to have purpose, substance, or utility apart from their anticipated tax consequences." 364 F.2d at 740. Our holding and that of the Circuit Court rested upon the principle established in *Knetsch v. United States,* 364 U.S. 361 (1960). In that case, the U.S. Supreme Court affirmed the lower court's disallowance of interest deductions stemming from seller-financing of an annuity and borrowings against the cash value of the annuity. The Court reasoned, "it is patent that there was nothing of substance to be realized by

Knetsch from this transaction beyond a tax deduction." 364 U.S. at 366.[14]

Further elaborating on that concept the Second Circuit reasoned that Congress intended through the broad language of section 163 to permit an interest deduction to encourage—

purposive activity to be financed through borrowing * * * In other words, the interest deduction should be permitted whenever it can be said that the taxpayer's desire to secure an interest deduction is only one of mixed motives that prompts the taxpayer to borrow funds; or, put a third way, the deduction is proper if there is some substance to the loan arrangement beyond the taxpayer's desire to secure the deduction. [*Goldstein v. Commissioner*, 364 F.2d at 741.]

With these principles in mind, we find that the 11 repo transactions, although 10 of them are not fictitious, lacked tax-independent purpose. We therefore hold that interest claimed on all repos may not be deducted. On the other hand, GSDII should not be treated as the owner of the T-Bills financed by those repos during the terms of those repos and should not recognize the relatively small amounts of interest income for 1981 or the "roll-over" amounts in 1982 attributable to such T-Bills.

Ten of the 11 T-Bill purchases initially were financed by relatively short-term repos. Those repos each bore an interest rate higher than the yield of the corresponding T-Bill. Although one might argue that GSDII now owned the T-Bill and it could hold the positions until repo interest decreased, the situation in form and substance is no different from that in *Goldstein*. As already noted, the NYH

---

[14]The facts in *Knetsch v. United States*, 364 U.S. 361 (1960), also reflect circumstances which are strikingly similar to this case. In *Knetsch* the taxpayer purchased from an insurance company $14 million in deferred annuity savings bonds for $4,000 cash and $4 million in nonrecourse annuity loan notes. Because the transaction was, in effect, an insurance contract, the bonds had a cash loan value of $100,000 over face each year. The taxpayer borrowed $99,000 against the loan value each year to make the interest payments so that the cash loan value of the contract increased only $1,000 per year. The interest deductions were not allowed for income tax purposes because "what was done, apart from the tax motive, was [not] the thing which the statute intended." *Knetsch v. United States*, 364 U.S. at 365. The Supreme Court explained that the transaction was in essence "a fiction, because each year Knetsch's annual borrowings kept the net cash value, on which any annuity or insurance payments would depend, at the relative pittance of $1,000. Plainly, therefore, Knetsch's transaction with the insurance company did 'not appreciably affect his beneficial interest except to reduce his tax. . . .' *Gilbert v. Commissioner*, 248 F.2d 399, 411 (dissenting opinion)." (Fn. ref. omitted.) *Knetsch v. United States, supra* at 366.

transaction involved an initial repo to maturity and thus did not afford any potential for profit.

After the initial purchase with repo interest in excess of T-Bill interest, four of the transactions involved intermediate repos that were entered into before repos to maturity (STU—$70 million; NSC—$75 million, $80 million; J&L—$80 million). We find these intermediate repos to be no different from the *Goldstein* situation for the same reasons as the initial repos. Six of the repos to maturity (J&L—$60 million, $80 million, $75 million, $25 million; NSC—$80 million; COW—$30 million) fixed GSDII's overall losses from given T-Bill transactions although they provided some carry (the market refers to a favorable differential as "carry"), partially reducing some of the losses from the unfavorable interest rate differentials of prior repos.

The remainder of the repos were even more clearly without substance. The NYH transaction involved an initial repo to maturity that bore a higher interest rate than the yield of the corresponding T-Bills. The transaction could only result in a fixed loss for GSDII, as evidenced by the fact that GSDII paid NYH the exact amount of the preordained loss at the outset of the transaction. Tax benefits could be the only purpose behind borrowing money at 10.88-percent interest in order to earn 10.42-percent interest. Thus, interest accruing on the repo with NYH may not be deducted.

Four other repos to maturity also clearly lacked substance and do not give rise to deductible interest. The contra-parties involved, the durations of the repos, and their interest rates were as follows:

| Contra-party | Duration (in days) | Rate |
|---|---|---|
| J&L | 45 | 10.30 |
| STU | 50 | 10.53 |
| NSC | 36 | 10.55 |
| NSC | 28 | 10.48 |

Those repos to maturity bore interest rates higher than the yields of the corresponding T-Bills, *without affording GSDII any potential for future profit.* Instead, the repos added to whatever losses GSDII had already suffered from repos involving unfavorable interest rate differentials. Ac-

cordingly, all 11 series of repos, at some point prior to the end of 1981, resulted in fixed losses from T-Bill transactions, with the minor exception that some of them had some amount of carry which partially reduced losses.

We are aware that the repo rates apply to somewhat smaller balances than do the T-Bill yields, because the repo prices equal the T-Bill prices less the haircuts paid. In spite of this, the following table demonstrates that each of the repos caused GSDII to incur interest expense in excess of the interest income attributable to the term of the repo:

| Purchase | Repo to maturity interest[15] | Pro rata portion of T-Bill discount[16] | Loss |
|---|---|---|---|
| J&L-$100m | $1,268,573.75 | $1,264,375.17 | $4,198.58 |
| STU-$70m | 1,006,704.56 | 1,001,388.62 | 5,315.94 |
| NSC-$85m | 885,540.63 | 883,999.84 | 1,540.79 |
| NSC-$75m | 604,944.90 | 603,750.00 | 1,194.90 |

Instead of entering into the four repos to maturity which exacerbated its losses, GSDII could have sold purchased T-Bills upon the expiration of initial or intermediate repos. Petitioners' explanations for GSDII's failure to sell a single T-Bill prior to maturity are wholly unpersuasive. In their reply brief, they argue (1) that "Wall Street Journal prices are not necessarily reflective of the prices at which a dealer can execute a transaction," (2) that "different dealers may have access to different information," and (3) that "quotations * * * do not take into account intra-day interest rate changes." Essentially, all three justifications amount to a claim by petitioners that GSDII lacked access to market information and, therefore, could not determine whether it made sense to sell T-Bills rather than enter into unfavorable repos to maturity. We reject petitioners' explanations as having no merit. Dr. Meiselman reported that T-Bills appreciated throughout December 1981, reflecting a demand generated by the tax advantages of earning income in 1 year and recognizing the income in a subsequent year. GSDII could have cut its losses or even profited by selling T-Bills. Its decision to refinance, in four instances, betrayed

[15]These figures were computed by multiplying the applicable repo prices by the repo rate and by a fraction, the numerator of which was the term of the repo (in days) and the denominator of which was 360.

[16]These figures were computed by multiplying the applicable T-Bill discount by the ratio of the repo term (in days) to the total number of days from T-Bill purchase to maturity.

an exclusive concern for tax benefits, i.e., a willingness to intentionally incur losses in order to defer the reporting of interest income until 1982 under section 454(b) by not selling the T-Bills.

It could be argued that GSDII entered into the five repos to maturity in order to profit from T-Bill appreciation. Assuming that T-Bills may be sold by their owner during the time they are "repoed out," we find such an argument unconvincing given petitioners' claim that GSDII was ignorant of market conditions. We believe that GSDII could have monitored the market, but did not, because GSDII's singular pursuit of tax benefits did not require knowledge of or a concern about T-Bill prices.

Distortion of taxable income occurs by allowing deductions for repo interest in a year prior to the year in which T-Bill income is recognized. Petitioner and Mr. Blumstein also apparently appreciated the 1-year income deferral available from the leveraged purchase of T-Bills. It was no coincidence that GSDI, GSDII, GSDIII, and GSDIV all began operations in the latter part of 4 consecutive years. Although the partnerships may have engaged in some Government securities trading in addition to the transactions in issue, we feel confident that a new partnership was formed late in each year specifically to take advantage of first-year income deferral under section 454(b).

There was tax motivation in the timing of the partnerships' formation and their leveraged purchase of T-Bills maturing in January. Congress, in enacting section 1281 and other special rules for debt instruments in 1984, acknowledged that under pre-1984 law, "interest on indebtedness incurred to purchase or carry obligations eligible for an exception [such as section 454(b)] can be deducted currently against ordinary income to generate a one-year tax deferral." H. Rept. 98-861 (Conf.) (1984), 1984-3 C.B. (Vol. 2) 61. Congress enacted sections 1281 through 1283 to eliminate the 1-year mismatching of income and expense for transactions like those in issue, but Congress did not make those provisions applicable to T-Bills and similar obligations that were acquired before 1984. Pub. L. 98-369, sec. 44(d), 98 Stat. 494, 560. Congress, by enacting sections 1281 through 1283, however, did not address the type of situa-

tion we are dealing with in this case—where the transaction was without substance.

Our holding also includes the $3,367.73 paid to HOB which may not be deducted as interest or otherwise. Although petitioners characterize the sum as interest, it is apparent that the sum was instead a fee for GSDII's fail. The payment does not meet the definition of interest— "compensation for the use or forbearance of money"—as HOB lent no amount to GSDII and did not extend credit in any other manner. *Goldstein v. Commissioner*, 44 T.C. 284, 296 (1965), affd. 364 F.2d 734 (2d Cir. 1966).

An overall comparison of this case with *Goldstein*, in concept and essence, reveals no material difference. Petitioner here, in conjunction with Mr. Blumstein (both of whom had some expertise in Government securities markets), caused GSDII to enter into T-Bill purchases and repos near the end of each year in order to generate approximately a four-to-one deduction[17] of interest for themselves and limited partners. Although petitioner and Mr. Blumstein may have had expertise in T-Bills and other Government securities, they, nevertheless, did not (on behalf of GSDII) make significant purchases, if any,[18] of T-Bills or enter into repos in order to profit from haircuts, carry, or interest differentials during other parts of 1981. As to the transactions in question, the only focus and obvious goal was to create an entity or vehicle at each year's end to generate interest deductions for themselves and the limited partners. The transactions under consideration are not part of a continuum of trading which just happened to occur at yearend. Instead, they clearly and succinctly represent transactions which each yearend were structured solely for the tax benefit and without any regard

---

[17]Petitioner *invested capital or cash of $26,000 in GSDII and respondent disallowed* $104,195 as petitioner's share of GSDII's accrued interest on the T-Bill/repo transactions. (104,195 ÷ by 26,000 = 4.0075)

[18]A review of the 1981 financial information in the record reveals little if any gain or loss from securities transactions other than those which are in issue in this case. As an example, respondent disallowed $104,195 of petitioners' total claimed loss of $106,069. Accordingly, only $1,874 or .017668 of the claimed loss could have represented loss from transactions other than the ones in issue.

or apparent concern for the profit or loss factor or any other "purposive" reason.[19]

That is not to say that people do not or cannot make profits in this type of transaction. We also recognize that taxpayers may structure their transactions so as to obtain the maximum benefit legally obtainable. *Gregory v. Helvering,* 293 U.S. 465 (1935). Here, however, the sole objective was to obtain the interest deduction. This is abundantly evidenced by the use of repos to market with locked-in losses in the transactions with no potential for any profit. In instances where intermediate repos could have or did generate some gain from the carry, these amounts were nominal, either fixed or short-term and stable and, in any event, merely reduced the fixed losses by relatively insignificant amounts. Accordingly, although a limited number of the short-term intermediate repos had a small potential for gain, the overriding and clear intent was to seek the interest deduction. We must bear in mind that neither an objective to make a profit nor the need for a trade or business, at least in 1981 and 1982, was a requirement for an interest deduction and are not the direct focus of our inquiry. We have analyzed the profit potential as part of the overall inquiry into whether these transactions had "purpose, substance, or utility apart from their anticipated tax consequences." *Goldstein v. Commissioner,* 364 F.2d at 740; *Knetsch v. United States,* 364 U.S. 361, 366 (1960).

Petitioners emphasize the use of the word "solely" in the *Goldstein* holding and argue that if there is any potential for profit the transaction has substance. Although there was no apparent potential for any gain, other than tax benefits, in *Goldstein,* we do not understand the principle of that case to, in any manner, exalt form over substance. The principle of that case would not, as petitioners suggest, permit deductions merely because a taxpayer had or experienced some de minimis gain. *Goldstein,* to the contrary, holds that the transactions, in form, were real, but that they lacked substance. That test was not a profit objective test. In explaining its rationale the Circuit Court stated:

---

[19]We do not question whether other dissimilar transactions of GSDII were with or without substance or whether GSDII was otherwise active and/or successful in the repo market. We only look to these yearend transactions which were structured for tax benefits.

In other words, the interest deduction should be permitted whenever it can be said that the taxpayer's desire to secure an interest deduction is only one of mixed motives that prompts the taxpayer to borrow funds; or, put a third way, *the deduction is proper if there is some substance to the loan arrangement beyond the taxpayer's desire to secure the deduction.* [*Goldstein v. Commissioner,* 364 F.2d at 741. Emphasis supplied.]

We see no essential or real difference between *Goldstein* and this case. Clearly, petitioner's and Mr. Blumstein's expertise permitted them to structure these deals using real transactions (with one exception). The fact that they permitted open positions for limited periods of time was obviously not for the objective of gain, but to formulate the appearance of potential for gain or loss. If the transactions had been fully offset, straddled, or hedged to obviate the possibility of any loss or gain, the form of the transaction could have been more readily attacked by respondent. The potential for "gain" here, however, is not the *sole* standard by which we judge, and in any event, is infinitesimally nominal and vastly insignificant when considered in comparison with the claimed deductions. Moreover, there was insufficient potential in any gain to offset the losses locked in for the 1981 transactions.

Petitioners argue that the 82-83 transactions resulted in net gains without considering tax benefits and that those gains should be considered in evaluating the potential for gains in 1981 transactions. Looking at the 82-83 net gains in a vacuum, one might conclude that an $18,380.61[20] gain on over $1 million capital investment reflects that the transaction has profit potential. But that would be like permitting one tree to block the view of the forest. Petitioner, Mr. Blumstein, and the limited partners were content with locking in about a $60,000 loss for 1981-82 transactions or locking in an $18,000 profit on the 82-83

---

[20]The 82-83 transactions (eight in number) altogether resulted in $18,380.61 of net gain. Of that amount, $13,168.50 was attributable to one transaction. The remaining seven transactions resulted in net gains and losses which were in amounts well within the "haircut" payments which were paid on the front end of the transactions.

Accordingly, 18 of the 19 transactions resulted in net gains or losses which were either smaller than or within a small percentage of approximately the haircut. With the one exception in the 82-83 transactions, the results were substantially comparable and, overall, reflect structured results. The results were designed to appear (and are with one exception) real for the sole purpose of generating an interest deduction due to mismatched income and deductions.

transactions. They were content because the $60,000 was a small "price" to pay for the more than $5 million in interest deductions that permitted offset against their ordinary income and deferral of that income to the next taxable year, when a new plan of deferral could be employed at yearend. These yearend deferrals may result in a limited amount of incidental gain or loss depending upon whether the interest rates were falling or rising. But the transactions were structured so that their full potential for such gains or losses was limited, either by the short-term exposure to some risk or by arranging the repo to market and fixing the position, be it an incidental gain or loss. We "have never held that the mere presence of an individual's profit objective will require us to recognize for tax purposes a transaction which lacks economic substance." *Cherin v. Commissioner*, 89 T.C. 986, 993 (1987), which was cited with approval in *Shriver v. Commissioner*, 899 F.2d 724, 727 (8th Cir. 1990), affg. a Memorandum Opinion of this Court.

In summary, the timing of the transactions here was critical and of overriding importance. The transactions were intentionally and cleverly structured to be and are real,[21] but are without substance within the meaning of established case precedent. The transactions occurred at yearend to create deferral for tax purposes irrespective of whether they resulted in gain or loss, which, as structured, were destined to be de minimis in amount.

Due to our finding that 10 of the 11 repo transactions in this case were real and that all of the transactions were without substance, it is unnecessary to consider whether the transactions should be characterized as forward contracts or secured loans. It is also unnecessary to consider the interest income issue raised under section 454(b).

*Negligence Additions*

Respondent seeks additions for negligence. Under section 6653(a)(1), "If any part of any underpayment * * * is due to negligence or intentional disregard of rules or regulations," an addition to tax of 5 percent of the entire underpayment is imposed. Further, section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest due on the portion

---

[21]We have found 10 of the 11 transactions to be "real."

of the underpayment "which is attributable to the negligence or intentional disregard." We have defined negligence as the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. *Neely v. Commissioner*, 85 T.C. 934, 947 (1985). Because respondent first asserted the negligence additions in an amendment to answer, respondent bears the burden of proving that the additions should be imposed. Rule 142(a).

The record discloses that GSDII, of which petitioner was a general partner, intentionally entered into loss-producing repos in order to generate and claim tax benefits. Petitioners' only response to respondent's request for the negligence additions is that such request is "frivolous" in view of the merits of their position on the main issues. Under the circumstances, we find that respondent has sustained his burden and that it is appropriate to impose the negligence additions.

*Section 6621(c) Increased Interest*

Section 6621(c)(1) provides for an increased interest rate on "any substantial underpayment attributable to tax motivated transactions." Section 6621(c)(3)(A) itemizes certain transactions that are deemed "tax motivated" within the meaning of the subsection. Among the listed transactions are those that are "sham or fraudulent." Sec. 6621(c)(3)(A)(v). In *Patin v. Commissioner*, 88 T.C. 1086, 1128-1129 (1987), affd. without published opinion sub nom. *Hatheway v. Commissioner*, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. *Skeen v. Commissioner*, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. *Gromberg v. Commissioner*, 868 F.2d 865 (6th Cir. 1989), we held that "economic shams," i.e., transactions which are disregarded for Federal income tax purposes because they lack economic substance, fall within section 6621(c)(3)(A)(v). Accordingly, petitioners are liable for increased interest.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

NIMS, CHABOT, PARKER, SHIELDS, HAMBLEN, WRIGHT, PARR, and COLVIN, *JJ.*, agree with the majority opinion.

RUWE, *J.*, did not participate in the consideration of this opinion.

---

WELLS, *J.*, concurring in part and dissenting in part:

I respectfully disagree with the majority's conclusion that all of the repos lacked economic substance and should therefore be disregarded for Federal income tax purposes. Although the majority purports to follow *Goldstein v. Commissioner*, 364 F.2d 734 (2d Cir. 1966), affg. 44 T.C. 284 (1965), the majority applies a new test for economic substance, one lacking any support in precedent, in order to disregard the repos. *Goldstein*, which I agree speaks to the issue before us, requires that some of the repos be respected for Federal income tax purposes, as discussed below.

*Economic Substance*

As noted, the majority applies an incorrect test for determining economic substance. Specifically, it holds that the repo-financed T-Bill purchases do not give rise to deductible interest because the potential profit from the transactions was nominal "in comparison with the claimed deductions." Majority op. at 768. I have found no authority for comparing potential profit with expected tax benefits when evaluating a transaction for economic substance. Rather, the economic-substance inquiry until now has been whether a transaction was "imbued with tax-independent considerations." *Frank Lyon Co. v. United States*, 435 U.S. 561, 572 (1978); *Hulter v. Commissioner*, 91 T.C. 371, 388 (1988). The test has been no different for loan transactions. In *Goldstein v. Commissioner*, 364 F.2d at 740, cited extensively by the majority, the Court of Appeals for the Second Circuit held, "Section 163(a) * * * does not permit a deduction for interest paid or accrued in loan arrangements, * * * that can not with reason be said to have purpose, substance or utility apart from their anticipated tax consequences."

To date the only instances I can find in which we have compared potential profit with expected tax benefits are

those in which we have evaluated a transaction for *profit objective*. The case often cited, although not by the majority, as authority for such an analysis is *Estate of Baron v. Commissioner,* 83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986), in which we stated,

we are not suggesting that there must always be a dollar-for-dollar matching [of pretax profit and tax benefits] * * * . Instead, we conclude that an intermediate position will usually be in order, namely, that the disparity between *before*-tax profit and tax benefits be weighed in the context of *all the factors involved in determining the existence of the requisite profit objective,* * * * [83 T.C. at 558. Second emphasis supplied.]

I believe the majority improperly evaluates the transactions in issue for economic substance by applying a test that heretofore has been used only in determining whether a taxpayer had an actual and honest profit objective for section 183 purposes.

In *Knetsch v. United States,* 364 U.S. 361 (1960), the progenitor of *Goldstein v. Commissioner, supra,* and other cases deciding whether debts have economic substance and therefore give rise to deductible interest, the Supreme Court warned against confusing the issues of economic substance and profit objective. The Court stated,

We put aside a finding by the District Court that Knetsch's "only motive in purchasing these 10 bonds was to attempt to secure an interest deduction." As was said in *Gregory v. Helvering,* 293 U.S. 465, 469, 55 S. Ct. 266, 267, 79 L.Ed. 596: "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. * * * But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." [364 U.S. at 365. Fn. ref. omitted.]

See also *Rose v. Commissioner,* 88 T.C. 386, 423 (1987), affd. 868 F.2d 851 (6th Cir. 1989) ("The requirement of a profit objective is not one of the limitations in section 163 on the deduction of interest actually paid.")

Thus, in examining the transactions in issue for economic substance, I suggest that we should ask whether, viewed objectively, they had tax-independent purpose. If they did, they were within the intendment of section 163. *Goldstein v. Commissioner,* 364 F.2d at 741.

The majority, rather than applying that settled principle, sets forth a new "de minimis" test for economic substance that I believe will have significant ramifications beyond the instant case.[1] Such a new test could require us to substitute our business judgment for that of taxpayers and disregard, for Federal income tax purposes, those transactions lacking *sufficient* potential profit in light of expected tax benefits. For example, applying such a test to sale and leaseback transactions, will we have to determine not only whether a transaction offers "a realistic opportunity of producing a profit" (*Levy v. Commissioner*, 91 T.C. 838, 854 (1988)), but also whether the potential profit from residual values is de minimis when compared to expected tax benefits?

Assuming an inquiry into whether a transaction offers enough profit is appropriate (and as indicated above, I believe it is not), then the proper analysis should be to compare the potential profit with the investment,[2] rather than to compare the potential profit with the expected tax benefits, as suggested by the majority, and heretofore a section 183 inquiry. I note also that in *Estate of Baron*, the inquiry was weighed along with other factors.

*Goldstein v. Commissioner*, 364 F.2d at 741, requires that borrowing be "purposive" in order to have substance. Borrowing satisfies that requirement if it enables a tax-payer to engage in an activity offering some return on investment. In the instant case, GSDII's cash investment in the T-Bill transactions was $55,964.29 (the sum of the "haircuts").[3] While GSDII lost $59,690.94 as a result of the transactions, it could have profited as much if interest rates had declined as much as GSDII had expected. GSDII, in fact, enjoyed a net profit of $18,380.61 from nearly identical

---

[1] By adopting this new test it appears that a new grandchild has been born in the name of Mrs. Gregory. See Gideon, "Mrs. Gregory's Grandchildren: Judicial Restriction of Tax Shelters," 5 Va. Tax Rev. 825 (1986).

[2] See "Mrs. Gregory's Grandchildren: Judicial Restriction of Tax Shelters," *supra* at 837-838. Mr. Gideon suggests a de minimis test is feasible, but also would compare the potential profit to investment rather than tax benefits.

[3] I recognize that GSDII's investment could be considered greater than this amount because it was liable to the contraparties for any deficiencies in repo principal and interest after application of the T-Bill proceeds and haircuts. GSDII's liability, however, was limited because the T-Bill proceeds could be used to satisfy its obligation and the haircuts represent at least an approximation of GSDII's exposure as a result of the transactions.

transactions entered into in 1982. Assuming[4] GSDII paid haircuts totaling the same percentage of T-Bills purchased as it did in 1981,[5] then its return on investment would have been 64 percent.[6] I fail to see how borrowing in order to realize a potential 64-percent return is purposeless. Neither, in light of GSDII's small exposure in these highly-leveraged transactions, can I see how the potential profit can be characterized as de minimis.

## Transactions in Issue

I would hold that the repo involved in the New York Hanseatic (NYH) transaction and four of the repos to maturity lacked economic substance but that the remaining repos should be respected for Federal income tax purposes because they were purposive borrowings.

Although the instant case involves 11 T-Bill purchases, all but the NYH purchase entailed two or three separate repos.[7] An initial repo financed each such purchase, and subsequent repos were refinancing arrangements, with each such purchase ultimately refinanced with a repo maturing on the same date as the corresponding T-Bills (a repo to maturity). All repos, including that involved in the NYH purchase, involved a separate negotiation of term and interest rate. Because each repo was a separate financing arrangement, I would examine each repo for economic substance. *Goldstein v. Commissioner,* 364 F.2d at 734 ("The deduction is proper if there is *some* substance to *the loan arrangement* beyond the taxpayer's desire to secure the deduction.") (Emphasis supplied.)

All of the *initial* repos except that involved in the NYH purchase had economic substance. Although those 10 repos each bore an interest rate higher than the yield of the corresponding T-Bills, they nevertheless enabled GSDII to acquire T-Bills and stand to benefit from favorable interest rate differentials, known by the market as "carry," on refinancing repos. The fact that repo rates did not decline as far as expected by GSDII does not detract from the fact

---

[4] Such an assumption is necessary because the record does not disclose the amount of the haircuts for the 1982 transactions.

[5] (.008 percent or $55,964.29/$69 million.)

[6] (.00008 × $360 million = $28,800 and $18,380.61/$28,800 = 64 percent)

[7] The purchase from NYH involved a single repo to maturity.

that the potential for profit existed when GSDII made the 10 T-Bill purchases and entered into the initial repos. The fact that the 1982 purchases resulted in a net profit illustrates that the 10 T-Bill purchases in issue (1981) had potential for profit, at least initially. The majority, in fact, acknowledges profit potential available to one transaction by stating, "GSDII would have profited from the transaction if the interest that it owed J&L under the repos had been less than the discount on the purchased T-Bills." Majority op. at 745.

Four of the T-Bill purchases involved "intermediate" repos that were entered into after initial repos and prior to the repos to maturity (repo with Stuart Bros. for $70 million, repos with Newcomb Securities Corp. for $75 million and $80 million, and repo with Jesup & Lamont Holding Co. for $80 million). Those repos, like the initial repos, had economic substance because they placed GSDII in a position to profit from future carry.

Finally, six of the repos to maturity (repos with Jesup & Lamont Holding Co. for $60 million, $80 million, $75 million, and $25 million; repo with Newcomb Securities Corp. for $80 million; and repo with Cowan & Co. for $30 million) had economic substance. Those repos had carry and enabled GSDII to recover partially losses suffered from the unfavorable interest rate differentials of prior repos.

I do not disagree with the majority's conclusion that the repo used to finance the NYH purchase and the remaining repos to maturity lacked economic substance. I also do not disagree with the majority's application of the determined additions to tax with respect to those repos as they did not afford GSDII any potential profit, but merely added to its net loss from the transactions. I also agree that petitioners should not be charged with T-Bill interest income attributable to those repos.

The majority states, "Although one might argue that GSDII now owned the T-Bill and it could hold the positions until repo interest decreased, the situation in form and substance is no different from that in *Goldstein*." Majority op. at 762. That statement is an unsupported conclusion. Rather than respond to an argument which I consider to have merit, the majority simply incants "*Goldstein*" and

leaves for the reader the task of refuting petitioner's argument and figuring out why the transactions in issue are "in form and substance" the same as those in *Goldstein.*

In *Goldstein,* the Second Circuit placed much emphasis on computations of the taxpayer's advisor which projected an economic loss of $18,500 and tax benefits in excess of that amount. 364 F.2d at 739. The court, after disagreeing with our conclusion that the transactions in that case were fictitious, concluded, "The Tax Court was justified in concluding that petitioner entered into the * * * transactions without *any* realistic expectation of profit and 'solely' in order to secure a large interest deduction." 364 F.2d at 740 (emphasis supplied). The absence of prearranged loss in the instant case makes *Goldstein* inapplicable to the initial repos, the intermediate repos, and the repos to maturity providing carry (all of which were purposive transactions).

The majority acknowledges that six of the repos to maturity were at a lower interest rate than the corresponding T-Bills, i.e., the repos provided carry. Majority op. at 763. The majority fails to explain, however, why such borrowings were purposeless within the meaning of *Goldstein.* Instead, the majority leaps forward to the repos to maturity which I agree lacked substance, i.e., those which merely added to GSDII's net loss, and states, "The remainder of the repos were *even more clearly without substance.*" Majority op. at 763 (emphasis supplied). I find the foregoing statement a tacit admission that the initial repos, the intermediate repos, and those repos to maturity providing "carry" did have tax-independent purpose, and that only "the remainder of the repos" fairly can be characterized as purposeless.[8]

The majority's statement, "Accordingly, all eleven series of repos, at some point prior to the end of 1981, resulted in fixed losses from T-Bill transactions, with the minor exception that some of them had some amount of carry which partially reduced losses" (majority op. at 763-764), is factually inaccurate. Only the *repos to maturity* fixed the amount of the net loss on each transaction. Each repo is a

---

[8]The holding with respect to the repos with carry (a positive interest rate differential) also contradicts our previous holding that loans facilitating profitable transactions have economic substance. *Mortensen v. Commissioner,* T.C. Memo. 1984-600.

separate transaction subject to negotiation under then prevailing market conditions, i.e., at interest rates then prevailing. Furthermore, if all repos lacked economic substance, regardless of carry or the potential for profit through favorable refinancing, I do not understand why the majority sets forth, in a table, the negative interest rate differential attributable to the four repos to maturity which I agree lacked substance. Majority op. at 764. The remainder of the majority opinion suggests that it is irrelevant whether or not a particular repo cost GSDII more in interest than it enabled GSDII to earn from T-Bill interest income.

The majority opinion is self-contradictory when it states, "Although the transactions were *not.* prearranged as between GSDII and the contra-parties, the transactions were planned and arranged by GSDII to appear regular and, at least with respect to the 1981-82 transactions, to have a *fixed loss* in an amount approximating the up-front payments to contra-parties." (Emphasis supplied.) The majority does not explain, nor do I understand, how a transaction can provide for a "fixed loss" and yet not be prearranged. The majority must concede that, except for the NYH transaction, the transactions in issue were not prearranged ab initio—they resulted in a net loss only because interest rates did not drop as far as anticipated by GSDII. In that regard, I take issue with the majority's finding that Price Waterhouse "treated the transactions in issue normally and without questioning their form." Majority op. at 749. The Price Waterhouse report specifically finds that GSDII was "exposed to market risk."

In numerous portions of the majority opinion, even in the findings (majority op. at 745), reference is made to the deferral of income facilitated by the transactions in issue. E.g., "Distortion of taxable income occurs by allowing deductions for repo interest in a year prior to the year in which T-Bill income is recognized." Majority op. at 765. See also majority op. at 752 and 759.[9] It is evident from the

[9]The majority opinion incorrectly states that GSDII claimed interest deductions attributable to the transactions entirely in 1981 while reporting interest income entirely in 1982. Majority op. at 752 note 7. GSDII reported interest expense using the accrual method of accounting. Majority op. at 739, 758. Thus, interest expense attributable to the repos was claimed in both 1981 and 1982.

majority opinion that deferral is the majority's real concern with the transactions in issue. As the majority opinion concedes, prior to statutory changes in 1984, such deferral was permitted by the operation of section 454(b). That Congress delayed in closing a "loophole" should not lead us to depart from settled principles respecting economic substance.

### Secured Loans or Forward Contracts

Because the majority holds that none of the repos had economic substance, it does not address the issue of whether the repos were, in fact, financing arrangements. Because I would hold that some of the repos should be respected for Federal income tax purposes, the issue must be addressed. We also did not need to reach the issue in *Price v. Commissioner*, 88 T.C. 860, 865 n. 9 (1987), but articulated it as follows:

> A controversy exists as to whether when one purchases securities from another and simultaneously enters into a repo transaction with the seller' the transaction should be characterized as a secured loan transaction (as petitioners * * * contend) or as a purchase with a forward contract for sale (as respondent contends). * * *

Petitioner argues that the repos were, in fact, secured loan agreements and that GSDII, as an accrual basis taxpayer, is entitled to deduct interest accruing under the repos over the period they were outstanding from November 1981 to January 1982.

Respondent counters by arguing that the repos were not financing arrangements but, instead, forward contracts for purchase of the securities. Accordingly, the expense associated with the interest element of a repo should be deductible not as accruing interest expense, but as loss from the sale of a security at the time the forward contract is closed on the maturity date of the repo.

By its terms, each repo in issue consisted of (1) an immediate T-Bill sale by GSDII to a contra-party at a specific price, and (2) an agreement by GSDII to repurchase in the future identical T-Bills from the contra-party at the first purchase price plus a specific amount of interest. In form, then, a T-Bill repo is a sale of T-Bills today and an

agreement to repurchase T-Bills at a later date. Respondent's forward contract argument is that the first leg of the T-Bill repos, i.e., the T-Bill sales, was cancelled in the instant case by GSDII's T-Bill purchases, leaving only the second leg of the T-Bill repos, i.e., GSDII's obligation to purchase T-Bills at repo maturity. The parties to T-Bill repos, however, treat them as loans secured by T-Bills.

*In re Bevill, Bresler & Schulman Asset Management Corp.,* 67 Bankr. 557, 594-596 (D. N.J. 1986), discusses how various cases have characterized repos. The District Court in *Bevill* interpreted securities fraud cases, especially *S.E.C. v. Drysdale Securities Corp.,* 785 F.2d 38, 41 (2d Cir. 1986), as viewing repos as purchases and sales, rather than loans.

At about the same time that *Bevill* was released, however, the Second Circuit, citing its *Drysdale* case, suggested that the question of whether a repo was a purchase/sale or a loan as yet was unresolved in that circuit. *Manufacturers Hanover Trust Co. v. Drysdale Securities Corp.,* 801 F.2d 13, 19 (2d Cir. 1986). The Second Circuit concluded that it did not need to resolve that issue in order to hold that transactions involving repos were subject to section 10(b) of the Securities Exchange Act and Rule 10b-5 of the Securities and Exchange Commission.

The Second Circuit also noted that several other courts had defined a repo as "in essence" or "in substance" a secured loan. *Manufacturers Hanover Trust Co. v. Drysdale Securities Corp.,* 801 F.2d at 19 (citing *In re Legel, Braswell Government Securities Corp.,* 648 F.2d 321, 324 n. 5 (5th Cir. 1981); *United States v. Erickson,* 601 F.2d 296, 300 n. 4 (7th Cir. 1979); *S.E.C. v. Miller,* 495 F. Supp. 465, 467 (S.D.N.Y. 1980); and *Ehrlich-Bober & Co. v. University of Houston,* 49 N.Y.2d 574, 404 N.E.2d 726, 728, 427 N.Y.S.2d 604, 606 (1980)).

The court in *Bevill,* after stating that repos are hybrid transactions which do not fit neatly into either a secured loan or purchase/sale classification, held that the repos therein, *for purposes of bankruptcy law,* were contracts for a current sale of securities and repurchase at a future date, not loan agreements. 67 Bankr. at 596-597, 598. Accord *In re Residential Resources Mortgage Investments Corp.* 98 Bankr. 2, 23 (Bankr. D. Ariz. 1989).

The court in *Bevill* also mentioned what it described as "tax cases" relating to "repurchase agreements," noting, however, that the transactions in those cases were not traditional repos. 67 Bankr. at 594. Those "tax cases"— *First American National Bank of Nashville v. United States*, 467 F.2d 1098 (6th Cir. 1972); *Union Planters National Bank of Memphis v. United States*, 426 F.2d 115 (6th Cir. 1970); and *American National Bank of Austin v. United States*, 421 F.2d 442 (5th Cir. 1970)—involved arrangements between banks and municipal bond dealers whereby a bank would "buy" municipal bonds and then resell the bonds to the dealers or the dealers' customers at the bank's purchase price. As compensation for the banks' efforts, they were entitled to the interest accruing on the bonds while they "owned" the bonds. In each of the three cases, the court held that the bank did not bear the risk of fluctuations in the bonds' market value, so that the bank was essentially a lender and was not entitled to be treated as owning the bonds and receiving interest on the bonds that was tax-exempt under section 103. 467 F.2d at 1101; 426 F.2d at 118; 421 F.2d at 453. The opinion in *Bevill* cited no other cases involving characterization of repos for purposes of Federal income taxation, and I am not aware of any cases deciding whether repos like those in issue should be treated for Federal income tax purposes as secured loans or as a sales/repurchases of securities.

I do believe, however, that the municipal bond repurchase agreement cases under section 103 are suitably analogous. In *Union Planters National Bank of Memphis v. United States, supra* at 118, the Sixth Circuit stated:

> In cases where the legal characterization of economic facts is decisive, the principle is well established that the tax consequences should be determined by the economic substance of the transaction, not the labels put on it for property law (or tax avoidance) purposes. *E.g., Commissioner of Internal Revenue v. P.G. Lake, Inc.*, 356 U.S. 260, 266-267, 78 S. Ct. 691, 2 L.Ed.2d 743 (1958); *Gregory v. Helvering*, 293 U.S. 465, 55 S. Ct. 166, 79 L.Ed. 596 (1935). "In the field of taxation, administrators of the laws, and the courts, are concerned with substance and realities * * * ." *Helvering v. F. & R. Lazarus & Co.*, 308 U.S. 252, 255, 60 S. Ct. 209, 210, 84 L.Ed. 226 (1939).

The true substance of a T-Bill repo is that the purchaser/reseller (one of the contra-parties herein, who are analogous

to the banks in the municipal bond cases), although nominally the owner of the T-Bills during the duration of the repo, does not bear any risk of a decline in the T-Bills' value and does not benefit from any increase in their value. The purchaser/reseller is entitled merely to the price it originally paid (i.e., the principal it "lent") plus interest on that price as compensation for the use of its money. Thus, the purchaser/reseller cannot be said to have purchased any T-Bills for Federal income tax purposes, where it has acquired none of the benefits or burdens of ownership of those T-Bills. *Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. 1221, 1237-1238 (1981). Instead, the purchaser/reseller has loaned the amount of the stated purchase price to the seller/repurchaser (GSDII herein, and the municipal bond dealers in the municipal bond cases) in exchange for a payment which is in the nature of interest. Such characterization also comports with the market's view of repos as secured loans.

I grant that, while a repo is open, the purchaser/reseller can sell the T-Bills acquired via the repo; however, any profit or loss on such a sale would be negated by an offsetting loss or profit when the purchaser/reseller is forced to acquire identical T-Bills to resell to the other party upon the repo's maturity. Accordingly, I would hold that the form of the T-Bill repos in issue does not control and that the economic substance of the repos is that of secured loan transactions rather than purchases/resales. Accordingly, the repos should be treated as loans for Federal income tax purposes.[10] See *Commissioner v. P.G. Lake, Inc.,* 356 U.S. 260, 266-267 (1958); *Union Planters National Bank of Memphis v. United States, supra* at 118.

That petitioners, not respondent, are contending that the substance of the transactions should govern, should not alter our conclusion. In one of the cases cited in *Union Planters National Bank of Memphis, Helvering v. F. & R. Lazarus & Co.,* 308 U.S. 252, 255 (1939), the Supreme Court permitted the taxpayer to recharacterize a sale as a

---

[10]One of respondent's own rulings, Rev. Rul. 77-59, 1977-1 C.B. 196, is in accord with such a view, ruling that repurchase agreements for U.S. Treasury obligations are considered to be loans and that income to the lender (the purchaser/reseller) qualifies as interest income. Respondent does not offer any argument that the repurchase agreements discussed in that Revenue Ruling should be treated differently than T-Bill repos.

mortgage and thereby retain depreciation deductions, over the Commissioner's objection.

Nor do I believe that the rule in *Danielson v. Commissioner*, 378 F.2d 771 (3d Cir. 1967), revg. and remanding 44 T.C. 549 (1965), binding a taxpayer to the terms of his agreement in the absence of mistake, undue influence, fraud, duress, or other circumstances warranting alteration or rescission of the agreement, applies in the instant case. That rule does not apply when an agreement is ambiguous. *Smith v. Commissioner*, 82 T.C. 705, 713-714 (1984). In the instant case, the repo agreements, although labeled sale and repurchase agreements, contained terms indicative of financing arrangements; specifically, the agreements contained interest rates and maturity dates.[11]

Moreover, GSDII did not choose the form of the transaction. Rather, that form was dictated by industry practice. The market cast repos as sales/repurchases rather than loans for a number of tax-independent reasons. For example, regulations prohibited certain investors, including municipal bodies, from making loans to securities dealers. Casting the transactions as sales/repurchases permitted avoidance of those restrictions. Recently, in *Anchor National Life Insurance Co. v. Commissioner*, 93 T.C. 382, 404 (1989), we held that "Certificates of Contribution" evidenced loans by the parent of an insurance corporation, not capital contributions, noting that the term was "nomenclature common in the insurance business to refer to a debt." Thus, business usage of terms must be taken into account. The foregoing could be the reasons respondent did not assert that the *Danielson* rule applies in the instant case.

For the foregoing reasons, I would hold that the repos in issue were financing arrangements and that GSDII is entitled to deduct repo interest accruing in 1981 on those repos that had economic substance.

---

[11]In *Coulter Electronics, Inc. v. Commissioner*, T.C. Memo. 1990-186, we held that the *Danielson* rule did not preclude the taxpayers from treating "sales" of leases as pledges of security for loans, in view of loan-type terms in the "sale" agreements. We stated:

In the instant case the original agreement * * * as well as the assignment forms used to transfer the leases * * * contain terms which denote a sale. Yet the original agreement and its subsequent amendments contain numerous provisions which are inconsistent with a sale and more like the terminology usually found in financing arrangements. * * * Therefore, neither *Danielson* nor the strong proof doctrine is applicable to this case. *Smith v. Commissioner*, *supra*. [59 T.C.M. 350, 364, 59 P-H Memo T.C. par. 90, 186 at 851-852].

As far as the interest income from the T-Bills in issue, I would hold that it should not be included in petitioners' 1981 taxable income because section 454(b) requires that discount on the T-Bills be included in taxable income only upon the T-Bills' maturity in 1982. That section provides that in the case of a short-term obligation of the United States which is issued and payable at a fixed maturity date without interest (such as a T-Bill), any discount does not accrue until the maturity date, unless the obligation is earlier sold or otherwise disposed of. Because I would find that GSDII owned the T-Bills purchased in November and December of 1981, I also would hold that section 454(b) provides that interest income from those T-Bills is not includable in GSDII's income until the maturity date of those T-Bills in January 1982.

*Conclusion*

The majority finds "no essential difference between *Goldstein* and this case." Majority op. at 768. I respectfully disagree. In *Goldstein,* the taxpayer's advisor had projected, *prior to the transactions in issue in that case,* an economic *loss* that would be more than offset by projected tax benefits. In the instant case, by contrast, GSDII anticipated an economic *profit,* and the potential for such profit existed when the T-Bills were initially purchased. The difference is critical and requires that we refrain from applying the economic substance doctrine to the purposive repos. Although the majority states, "The potential for 'gain' here, however, is not the *sole* standard by which we judge" (emphasis in original), that is *the* standard under *Goldstein,* to which the majority purports to be faithful. I believe the majority in fact judges the transactions solely in reference to tax benefits in order to deny what it perceives to be excessive tax benefits.

When Congress eliminated the deferral opportunity by enacting section 1281 and other special rules for debt instruments in 1984, it acknowledged that under pre-1984 law, "interest on indebtedness incurred to purchase or carry obligations eligible for an exception [such as section 454(b)] can be deducted currently against ordinary income to generate a one-year tax deferral." H. Rept. 98-861 (Conf.)

(1984), 1984-3 C.B. (Vol. 2) 61. Congress enacted sections 1281 through 1283 to eliminate the 1-year mismatching of income and expense for transactions like those in issue, but Congress chose not to make those provisions applicable to T-Bills and similar obligations that were acquired before 1984. Pub. L. 98-369, sec. 44(d), 98 Stat. 494, 560. It is not within our province to do what Congress failed to do or elected not to do. *Hanover Bank v. Commissioner,* 369 U.S. 672, 688 (1962).

For the foregoing reasons, I respectfully dissent with respect to the purposive repos.

KÖRNER, COHEN, CLAPP, SWIFT, JACOBS, and WHALEN, *JJ.,* agree with this dissent