MARVIN LIEBER AND PATRICIA LIEBER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JAY FREED AND MICHELLE FREED, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lieber v. Commissioner
Docket Nos. 398-91, 17980-91
United States Tax Court
T.C. Memo 1993-424; 1993 Tax Ct. Memo LEXIS 435; 66 T.C.M. (CCH) 722; September 14, 1993, Filed *435 Decisions will be entered under Rule 155. Held: Ps' lacked a profit objective with respect to the purchase and lease transaction at issue. Accordingly, the majority of deductions claimed by Ps with respect thereto are disallowed. Sec. 183, I.R.C. However, Ps are entitled to an interest deduction under sec. 163, I.R.C.Jacobson v. Commissioner, 915 F.2d 832, 840 (2d Cir. 1990); Golsen v. Commissioner, 54 T.C. 742 (1970). For petitioners: James J. Mahon. For respondent: Catherine R. Chastanet and Mark L. Hulse. HALPERN
HALPERN
MEMORANDUM FINDINGS OF FACT AND OPINION HALPERN, Judge: Respondent determined deficiencies in petitioners' Federal income taxes, additional interest, and an addition to tax as follows: Marvin Lieber and Patricia Lieber, docket No. 398-91
Additional Interest & Additions to Tax
Year
Deficiency
Sec. 6621(c)
Sec. 6661 1983
$ 9,091
[1]
$ 2,255
1984
12,770
[1]
3,193
1985
7,019
[1]
1,755
1986
10,234
[1]
2,559
*436 Jay Freed and Michelle Freed, docket No. 17980-91
Jay Freed and Michelle Freed, docket No. 17980-91
Additional Interest & Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6621(c)
6661
6653(a)(1)
6653(a)(2)
1983
$ 5,447
[1]
$ 1,362
$ 539
[2]
1984
14,827
[1]
3,707
996
[2]
Certain adjustments having been agreed to and concessions made, the issues remaining for decision are: (1) Whether petitioners had a profit objective in entering into the purchase and lease transaction; (2) whether the purchase and lease transaction had economic substance; (3) whether petitioners acquired the benefits and burdens of ownership of the computer equipment involved in the purchase and lease transaction; (4) whether petitioners were at risk, within the meaning of section 465, with respect to the promissory note used to purchase the computer equipment; (5) whether respondent properly disallowed deductions *437 for interest expense and management and brokerage fees connected with the purchase and lease transaction; (6) whether petitioners' underpayments of tax (if there be any) are attributable to a tax-motivated transaction within the meaning of section 6621(c); (7) whether petitioners substantially understated their tax liabilities within the meaning of section 6661; and (8) whether petitioners Jay and Michelle Freed were negligent (or willfully disregarded rules or regulations) within the meaning of section 6653(a). [1]
All of respondent's adjustments still at issue derive from her disallowance of deductions claimed in connection with petitioners' participation in a purchase and *438 lease transaction involving certain computer equipment. If we resolve any of the first three above-stated issues in the negative, respondent will prevail as to all adjustments at issue herein, except, perhaps, the claimed deductions for interest and management and brokerage fees. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts filed by the parties and attached exhibits are incorporated herein by this reference. Petitioners Marvin and Patricia Lieber resided in Stoney Brook, New York, at the time their petition herein was filed. Petitioners Jay and Michelle Fried resided in East Norwich, New York, at the time their petition herein was filed. Petitioners Marvin Lieber and Jay Freed (hereinafter petitioners) are medical doctors specializing in pediatrics and were graduated from medical school in 1972 and 1973, respectively. Since 1976 and during all years at issue, petitioners practiced in a medical partnership with Arnold Scherz *439 (Scherz). Petitioners and Scherz (investors) became involved in the purchase and lease transaction at issue in this case. The Ralion-American Cancer Society Transaction
On December 16, 1982, Ralion Corp. (Ralion), a corporation involved in the equipment leasing business, entered into a lease with the American Cancer Society (ACS) whereby Ralion agreed to lease to ACS certain computer equipment manufactured by International Business Machines (Ralion-ACS lease or ACS' lease). That computer equipment was listed in three separate schedules; only the equipment listed on the second schedule (the schedule 2 equipment) is involved in the purchase and lease transaction later entered into by investors. According to the Ralion-ACS lease, the list price of the schedule 2 equipment is $ 306,355. The Ralion-ACS lease provided, inter alia, that Ralion would lease the schedule 2 equipment to ACS for a period of 48 months, at a monthly rental of $ 6,740. That lease further provided that ACS could extend the lease [2] or purchase the equipment at its fair market value (as determined by averaging three independent appraisals). At the time the Ralion-ACS lease was entered into, Ralion did *440 not own the computer equipment that was the subject matter of such lease. On January 6, 1983, ACS purchased the computer equipment listed in the three schedules of the Ralion-ACS lease at a price not indicated in the record. On the same day, ACS sold such equipment to Ralion, subject to the lease of December 16, 1982, for a price not indicated in the record. Ralion financed that purchase by obtaining a nonrecourse loan from Lincoln Lease/Way, Inc. (Lincoln). Pursuant to the loan agreement, Ralion provided Lincoln with a security interest in the three schedules of equipment and agreed to make 48 equal, monthly installments of principal and interest. Under the terms of the Ralion-ACS lease, ACS (the lessee) agreed to make payments to Lincoln on Ralion's loan, rather than pay *441 Ralion directly. The Ralion-Soundview Transaction
On June 15, 1983, Ralion sold the three schedules of equipment to Soundview Leasing Co., Inc. (Soundview), subject to ACS' lease. The purchase price for all three schedules was $ 926,526.38, consisting of $ 45,000 in cash, notes of $ 30,000 and $ 45,000, and taking subject to the obligation to Lincoln (which obligation was secured by the three schedules of equipment). [3] The record does not indicate the price of the schedule 2 equipment specifically. The Soundview-Cliftonpark Transaction
On September 2, 1983, Soundview sold the schedule 2 equipment to Cliftonpark Business *442 Associates, Inc. (Cliftonpark), consisting of $ 86,077 in cash and a recourse note in the amount of $ 264,231. Cliftonpark took the schedule 2 equipment subject to ACS' lease and Lincoln's security interest. Investors' Purchase and Lease Transaction With Cliftonpark and Soundview; the Management Agreement With Icon
Purchase From Cliftonpark
On September 2, 1983, investors purchased the schedule 2 equipment (the equipment) from Cliftonpark for $ 352,308, consisting of $ 88,077 in cash and a recourse note in the amount of $ 264,231. [4] Investors took the equipment subject to ACS' lease and Lincoln's security interest, and provided Cliftonpark with a security interest in the equipment and all related leases. None of the investors has any interest in Cliftonpark. Management Agreement With Icon
On the same day, investors entered into *443 a "management agreement" with Icon Group, Inc. (Icon). Pursuant to the management agreement, Icon was to manage the equipment for the lesser of 20 years or however long investors continued to own such equipment. Icon's duties involved collecting rent from the prospective lessee, making payments to Cliftonpark, and using "reasonable commercial efforts to market the Equipment under any terms and conditions it, in its sole discretion, deems advantageous." [5] In order to finance the operation (i.e., meet its cash-flow needs), investors were to pay Icon (acting as their agent) $ 18,000 in cash and $ 97,000 in notes. [6] Under the management agreement, Icon also agreed to make interest-free, "cash-flow" loans to investors in amounts not to exceed a total of $ 14,800 (to be repaid "when operating cash is available"). In consideration of Icon's efforts pursuant to the management agreement, Icon was to receive a fixed fee of $ 9,600 annually during 1983, 1984, and 1985, and $ 5,000 annually thereafter (until the termination of the management agreement), as well as other, nonfixed consideration. Net cash proceeds resulting from the sale or other disposition of the equipment were to be applied *444 first to satisfy outstanding debts and liabilities related to the equipment; second, to establish any reserve Icon deems appropriate; and third, apportioned between Icon and investors as follows: 75 percent to investors, and 25 percent to Icon, until investors recoup their original cash investment ($ 88,077); 50 percent to investors and 50 percent to Icon thereafter. *445 Lease to Soundview
Also on the same day, investors entered into separate agreements with Soundview, whereby investors (collectively) leased the equipment to Soundview for 100 months, beginning September 1, 1983, subject to ACS's underlying lease and Lincoln's security interest. Soundview was to pay investors the following fixed consideration: [7] *446 Months
Monthly Rental
Annual Rental
0-2
0
0
3-28
$ 3,000
$ 36,000
29-100
6,650
79,800
Soundview also was to pay investors certain nonfixed "supplemental rent" earned from successful remarketing of the equipment at the conclusion of the underlying lease with ACS. [8] Upon the expiration of ACS' lease, Soundview was to pay investors 75 percent of all amounts received from successful remarketing until investors receive $ 108,120; thereafter, Soundview was to pay investors 50 percent of all such amounts received. None of the investors has any interest in Soundview. Soundview and Cliftonpark have no common shareholders or officers. Petitioners' Investigation of the Transaction
Petitioners' accountant, Jerry Dorfman, introduced Eric Riedman (Riedman) to petitioners. Riedman, an "investment advisor", recommended various investments to petitioners, including the computer equipment leasing transaction at issue herein. Petitioners have never compensated Riedman for his investment advice; instead, Riedman has received compensation from the promoters of such investments for locating participants. [9] Riedman informed petitioners that he was compensated in this way. Riedman contacted petitioners (and perhaps Scherz) in spring or summer 1983 to propose the purchase and lease transaction at issue. Riedman had learned of the transaction from Peter D. Beekman (Beekman), *447 President of Icon, which was the promoter. Beekman also is the sole shareholder of International Consolidated Group, which is the sole shareholder of Icon. [10] Neither petitioners nor Riedman retained counsel to review the transaction documents relating to the transaction at issue. Petitioners never were provided a prospectus or offering memorandum relating to the purchase and lease transaction at issue. The Icon Financial Forecast
Beekman caused Icon to prepare a report projecting the transaction's financial performance. That report was entitled: "The Lieber Management Account (M006) Financial Forecasts For The Period December 1, 1983 to December 31, 1991" (the Icon forecast). Near the outset, the Icon forecast makes the following disclaimer: The forecast is an estimate of the most probable results of one or more future periods, and reflects our judgment, based on present circumstances, of the most likely set of conditions. Forecasts *448 are based on assumptions about circumstances and events that have not yet taken place and are subject to variations, and there is no assurance that the forecasted results will be attained.
The bulk of the Icon forecast is dedicated to computations of income, expenses, and tax benefits, including "accumulated tax leverage", throughout the 100-month period of the Soundview lease. [11] *449 Those computations, as suggested by the disclaimer appearing above, are based on certain "assumptions", the accuracy of which could not be known at that time. Those assumptions are set forth in slightly more than two pages at the end of the Icon forecast, in a section entitled "Summary of Significant Forecast Assumptions". One pertinent assumption made therein is that, subsequent to the 48-month period of ACS' lease (ending no later than September 1987), another lease arrangement will be entered into, such that supplemental income will be paid to investors, commencing January 1, 1989, under the terms of the remarketing arrangement with Soundview. [12]
The "Summary of Significant Forecast Assumptions" specifically indicates neither the rent it predicts the equipment will generate nor the supplemental income it predicts Soundview will pay investors. The Icon forecast's chart of income and expenses, however, is based on annual supplemental rent of $ 20,612, which would be consistent with the equipment's generating annual rental income in the amount of $ 27,482.67, [13] or monthly rental income in the amount of $ 2,290.22 ($ 27,482.67/12 = $ 2,290.22). *450 The Icon forecast's only explanation of that figure is the assertion that the projections of supplemental income "are based on a residual value of the equipment equal to 20% of the purchase price, a 36 month lease and a 10.5% lease factor." The Icon forecast does not explain how the residual value projection supports the assumption that the equipment will generate monthly rent in the amount of $ 2,290.22. The Icon forecast also assumes that, upon the conclusion of the lease term, on December 31, 1991, the equipment will be sold for approximately 20 percent of its original cost. The Icon forecast does not reconcile that assumption with its prediction that the equipment will be worth 20 percent of its original cost 3 years earlier, on January 1, 1989. Except as noted, the Icon forecast does not support or explain any of the assumptions discussed above. Further, the Icon forecast does not make clear whether it purportedly is based on an analysis of such assumptions -- and the conclusion that they are reasonable -- or, alternatively, is solely a calculation of the financial consequences that would occur if such assumptions were to be realized. The CVA Appraisal
Icon retained *451 James Cuthbert (Cuthbert), doing business as Computer Value Associates (CVA), to prepare a report appraising the equipment that was the subject matter of the purchase and lease transaction at issue (the CVA appraisal). CVA charged Icon $ 300 for the appraisal. Neither petitioners nor Riedman played any role in selecting CVA to perform the appraisal. The appraisal is dated September 15, 1983, 13 days after investors entered into the transaction at issue. (Mr. Cuthbert testified at trial that he prepared the appraisal between June and August 1983.) Like the Icon forecast, the CVA appraisal is conclusory. After stating the purpose of the appraisal, listing Cuthbert's background and qualifications, and setting forth certain established information (regarding the purchase price, the equipment involved, and the lease with Soundview), the remainder of the CVA appraisal reads in full as follows: USEFUL LIFE: It is expected that the Systems described in Exhibit A will have a useful life of approximately 11 to 12 years. SUPPLEMENTAL VALUE: In 60 months, we project that the value of the Systems will generate rental of approximately three to four thousand dollars per month *452 ($ 3,000 - $ 4,000/mo.) RESALE VALUE: In 100 months, we project that the value of the Systems will be approximately 25-30% of the original purchase price.
The CVA appraisal fails to explain how the above conclusions were reached. Petitioners did not investigate Cuthbert or his credentials; they relied upon Riedman to do so. OPINION I. Profit Objective
Section 183(a) provides that "if * * * [an] activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Simply put, an individual must engage in an activity with the actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The determination of whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Brannen v. Commissioner, 78 T.C. 471, 506 (1982), affd. 722 F.2d 695 (11th Cir. 1984); sec. 1.183-2(a), *453 Income Tax Regs. The objective facts are to be accorded greater weight than petitioners' own statements of intent. Brannen v. Commissioner, supra at 506; sec. 1.183-2(a), Income Tax Regs. Generally, the taxpayer's objective must be to achieve a profit independent of tax savings. See Estate of Baron v. Commissioner, 83 T.C. 542, 558-559 (1984), affd. 798 F.2d 65 (2d Cir. 1986). Several factors, none of which constitutes a "smoking gun", prevent us from concluding that petitioners had a profit objective. First, both the Icon forecast's and the CVA appraisal's predictions of economic profits are conclusory, and are therefore unlikely to inspire honest reliance. Specifically, critical assumptions as to supplemental lease income (the Icon forecast only), useful life (the CVA appraisal only), and the equipment's residual value at the end of the lease with Soundview (both reports) are wholly unsupported. [14] In fact, neither the CVA appraisal nor the Icon forecast even states separate useful lives or residual values for each item of equipment. [15] Moreover, as noted above, the Icon forecast *454 does not make clear whether its purpose includes determining that the stated assumptions are reasonable, or is limited to computing the (potential) result of such assumptions' being accurate. In light of such reports' being "long on conclusions, but short on reasoning", we are skeptical that intelligent, educated persons such *455 as petitioners would rely thereon in the hope of a profit independent of tax considerations. [16]Gilman v. Commissioner, T.C. Memo. 1989-684, vacated as to another issue T.C. Memo. 1990-205, affd. 933 F.2d 143 (2d Cir. 1991); accord Mele v. Commissioner, T.C. Memo. 1988-409 (appraisal "not a document worthy of reliance" because it was "nothing more than a listing of unsupported conclusions as to the [computer] Equipment's value."). *456 Second, the reports emphasize tax benefits, including net losses and substantial "accumulated tax leverage", enjoyed during the first 5 years of the enterprise. The emphasis on tax benefits militates against the existence of a profit objective. See, e.g., sec. 1.183-2(b)(8), Income Tax Regs.
Third, the management agreement entered into with Icon does not seem sensible for an investor seeking a before-tax profit. As noted, investors agreed to pay Icon a minimum fee of $ 9,600 annually during 1983, 1984, and 1985, and $ 5,000 annually thereafter, for the lesser of 20 years or however long investors continued to own the equipment; upon the sale or disposition of the equipment, investors were to pay Icon additional amounts set forth above. Disregarding present value, Icon's fee would total $ 58,800 at the conclusion of Soundview's lease in 1991, apart from any fee it would receive upon the sale or disposition of the equipment. It is difficult, however, to discern why a rational, profit-seeking person would pay Icon $ 58,800 (or more) for its services. According to the management agreement, Icon's services included collecting rent from the prospective lessee (Soundview), making *457 payments to Cliftonpark, and attempting to market the equipment at the conclusion of the lease with Soundview (for which it would receive amounts in addition to the yearly fee). [17] If Icon made no effort to market the equipment, it still would receive $ 9,600 or $ 5,000 each year for little more than depositing and writing checks; that does not appear to be an arm's-length arrangement. Even assuming that Icon necessarily was to make efforts to remarket the equipment, and that a portion of the fixed yearly fee (as opposed to merely the nonfixed, contingent fee) is allocable to that task, it is difficult to see how Icon could earn its fee; the management arrangement does not appear to be an arm's-length arrangement. *458 According to the management agreement, Icon secured the lease with Soundview. Inasmuch as Soundview is wholly owned by Icon (the promotor) and that lease was entered into concurrently with the management agreement, it would not appear that any substantial part of Icon's remarketing efforts (for which it was to receive a substantial fixed fee) is allocable to securing the lease with Soundview. Rather, it would appear much of Icon's roughly $ 58,000 fixed fee is allocable to Icon's efforts to remarket the equipment at the conclusion of the 100-month lease with Soundview. The equipment's value at that time, however, could not have been sufficient to warrant such a gross expenditure as (part of) a remarketing fee. According to the CVA appraisal, which contains the most favorable estimate of the equipment's residual value under consideration, the equipment would be worth no more than 30 percent of the original purchase price. As indicated by the Ralion-ACS lease, the equipment's list price, for which we presume it originally was purchased, is $ 306,355; 30 percent of that amount is $ 91,906.50. We do not think petitioners (and Scherz) rationally would pay (the lion's share of) $ *459 58,800 (plus additional amounts) for remarketing efforts respecting equipment that, at the relevant time, could be worth at most $ 91,906.50. Moreover, much of Beekman's testimony and petitioners' argument on brief seems inconsistent with the notion that significant remarketing efforts were expected to be necessary. Petitioners argue on brief as follows: Icon, at the inception of the transaction, had every expectation that the American Cancer Society would be the logical end-user for the post 1986 period. In fact, Beekman testified that * * * "the best place to relet equipment is the existing lessees." * * * Riedman for his part in evaluating the investment for his clients, believed that the American Cancer Society would release the equipment because as "a philanthropic organization, I felt there wouldn't be the pressure to get rid of equipment so easily, whereas with, perhaps a corporation, they might tend to just jump at some other equipment even if the original equipment was not obsolete."
Thus, it appears from petitioners' argument and Beekman's testimony that petitioners fully expected ACS to remain the end-user of the equipment. In light of that expectation, *460 it is difficult to understand why tens of thousands of dollars might rationally be spent for remarketing services that were expected to be unnecessary. [18] We think that petitioners also would have had difficulty understanding that arrangement if they had been interested in a profit independent of tax considerations. [19]
*461 The most that petitioners can offer in support of their asserted profit objective is that, in addition to the reports, they relied on Riedman. Fleshing out their argument a bit, petitioners presumably would have us believe that they placed such great trust in Riedman that they considered it unnecessary to scrutinize the reports provided by Icon. We accept that an investor, in certain circumstances, might trust his advisor to that degree. We think, however, that such a high level of trust is the exception rather than the rule. The record lacks any indication that petitioners had any reason (such as a close personal relationship with Riedman) to trust Riedman to that degree. Moreover, petitioners knew that Riedman was compensated by Icon (the promotor), and therefore had all the more reason to question his recommendations. Thus, we are not persuaded that petitioners' purported trust in Riedman explains their failure to scrutinize the reports provided by Icon, or the apparent inconsistency of that failure with their purported profit objective. We conclude that petitioners lacked a profit objective with respect to the purchase and lease transaction at issue. Accordingly, the majority *462 of deductions claimed by petitioners with respect thereto are disallowed. [20]
II. Interest[21]
*463 Petitioners seek interest deductions under section 163(a) with respect to indebtedness incurred in connection with the computer purchase and lease transaction at issue. Respondent argues that (1) the indebtedness is not genuine, and (2) even if the debt were genuine, the interest deduction must be disallowed because "the [sale and lease] transaction lacked economic substance and petitioners lacked a business purpose in entering it." We consider each argument in turn. Genuine Indebtedness
It is well established that, for interest to be deductible under section 163(a), the underlying indebtedness must be genuine. E.g., Knetsch v. United States, 364 U.S. 361 (1960). Further, we have held that debt, to be genuine, must have been intended to be enforceable when entered into. Warren v. Commissioner, T.C. Memo. 1989-34. Respondent argues that petitioners' note to Cliftonpark (the Cliftonpark note) was not intended to be enforced, and therefore did not represent genuine debt. We cannot agree that the Cliftonpark note was not intended to be enforced. In Warren v. Commissioner, supra, *464 we considered the following circumstances suspicious and therefore gave the notes at issue careful scrutiny: (1) The notes were nonnegotiable; (2) the notes' debt service payments were fully offset by lease payments payable by the seller-lender-lessee (lender); (3) the taxpayer never paid out-of-pocket cash on the note; and (4) the taxpayer and lender were related. Upon close examination of the record, we further found that: (1) There was no evidence that the lender kept an account for the taxpayer in which it offset the rent owed to him against the note payments due from him, or that the lender reported its corresponding interest income on its Federal income tax returns; and (2) the taxpayer's testimony evidenced an apathy toward whether his lender-lessee was applying the full rent due to his debt service. Id.
Respondent contends that certain of the facts present in Warren are present here as well, and are sufficient to compel a similar conclusion herein. We disagree. In significant contrast with Warren, we here deal with a sale and lease transaction directly involving three parties (Cliftonpark, investors, and Soundview), rather than a sale-leaseback involving only *465 two (and which was found to lack economic substance). [22] Further, the taxpayers herein are related to neither the lender (Cliftonpark) nor the lessee (Soundview), and respondent has pointed to nothing in the record indicating that either investors or Cliftonpark were indifferent to whether the notes involved were enforced. In short, we see no basis for the conclusion that Cliftonpark did not expect to be paid. We find that the Cliftonpark note was intended to be enforced and represents genuine indebtedness. Tax-Independent Purpose
Respondent argues that, when a transaction is motivated solely by tax-avoidance considerations, no interest deduction will be allowed in connection therewith, even if the underlying debt is genuine. In support of that argument, respondent cites Gilman v. Commissioner, T.C. Memo. 1989-684, vacated in part T.C. Memo. 1990-205, affd. 933 F.2d 143 (2d Cir. 1991). *466 In our first opinion in Gilman v. Commissioner, T.C. Memo. 1989-684, we took the view urged by respondent herein. Since petitioner also lacked a business purpose, the transaction will not be respected for Federal tax purposes. Petitioner's depreciation and interest deductions therefore are disallowed. [Id.]
However, in our supplemental opinion, T.C. Memo. 1990-205, we vacated that holding and allowed the interest deduction, citing respondent's concession and Rose v. Commissioner, 88 T.C. 386, 423 (1987), affd. 868 F.2d 851 (6th Cir. 1989) (following Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 96 (4th Cir. 1985), revg. in part 81 T.C. 184 (1983)). In Rose, we held as follows: Even if the notes themselves do not give rise to tax deductions because they were payments for anticipated tax benefits, the interest actually paid on those notes is deductible under section 163. * * * In other words, the requirement of a profit objective [or other tax-independent motive] is not one *467 of the limitations in section 163 on the deduction of interest actually paid. * * * [Id.]
Therefore, it would appear that, under Rose, we should allow the deduction. However, in Sheldon v. Commissioner, 94 T.C. 738 (1990), we took a position at least seemingly inconsistent with that taken in Rose, suggesting that a deduction is not allowed where the taxpayer lacks a tax-independent purpose. "Loans or other financing transactions will merit respect and give rise to deductible interest only if there is some tax-independent purpose for the transactions." Id. at 759. Fortunately, we need not resolve the tension between Rose and Sheldon at this time. The Court of Appeals for the Second Circuit, to which an appeal would lie, recently articulated a position on this matter. Jacobson v. Commissioner, 915 F.2d 832, 840 (2d Cir. 1990), revg. T.C. Memo. 1988-341. The Second Circuit's position is as follows: Even if the motive for a transaction is to avoid taxes, interest incurred therein may still be deductible if it relates to economically *468 substantive indebtedness. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 96 (4th Cir. 1985). * * * [Id.]
Therefore, accepting arguendo that our position is different, we will follow the Court of Appeals for the Second Circuit in accordance with the doctrine of Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). [23] Accordingly, we hold that petitioners are entitled to the interest deduction claimed herein.
*469 III. Section 6621(c): Increased Interest
Section 6621(c) provides for increased interest (120 percent of the usual rate) in the case of a substantial underpayment attributable to a tax-motivated transaction. Sec. 6621(c)(1). The underpayments, which exceed $ 1,000 for all years at issue, clearly are "substantial", as defined by section 6621(c)(2). The only question, therefore, is whether the purchase and lease transaction at issue is "tax motivated" within the meaning of section 6621. Inasmuch as petitioners lacked a profit objective, and entered into the purchase and lease transaction primarily for the tax benefits, such transaction unquestionably was tax motivated. Sec. 301.6621-2T (Q&A-4), Temporary Proced. and Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984). IV. Section 6661: Substantial Understatement
Section 6661(a) provides that, "If there is a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 25 percent of the amount of any underpayment attributable to such understatement." An understatement (for taxpayers other than certain corporations) is substantial if *470 it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). Petitioners bear the burden of proof on this issue. Rule 142(a). Petitioners have failed to challenge the additions to tax under section 6661, except insofar as they have challenged the understatements upon which such additions are based. Having resolved that objection in favor of respondent, and there being no others, we uphold the section 6661 additions to tax. V. Section 6653(a): Negligence
Section 6653(a) provides that, if any portion of an underpayment of tax is due to negligence or intentional disregard of rules or regulations (collectively referred to as negligence), there shall be added to the tax amounts equal to (1) 5 percent of the entire underpayment, and (2) 50 percent of the interest payable (under section 6601) with respect only to the portion of the underpayment attributable to such negligence. Respondent has determined the additions to tax for negligence only against petitioners Jay and Michelle Freed. The burden of proof as to negligence is on petitioners. Rule 142(a). Petitioners rely principally on their challenge to the underlying *471 deficiency determinations as a defense to the section 6653(a) additions to tax. Having resolved that challenge in favor of respondent, we are prepared to uphold the section 6653(a) additions. Nevertheless, on brief, petitioners also argue that: "Petitioners, aided by an investment advisor and after reviewing the transaction with their accountant, entered into this computer leasing venture believing that a profit would be generated and that the tax laws had been complied with." A taxpayer may defend himself against a determination that he was negligent by showing that he reasonably relied upon the advice of a qualified advisor in acting as he did. E.g., Ewing v. Commissioner, 91 T.C. 396, 423 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991). Here, besides petitioners' assertion that it is so, there is no evidence to support petitioners' vague assertion that "the tax laws had been complied with", which we take to be petitioners' claim that the Freeds relied on a qualified tax advisor. Reidman was not shown to be a competent tax advisor; neither is there significant evidence of any tax advice given by *472 their accountant (Jerry Dorfman) of the type on which the Freeds could rely. See, e.g., id. at 423-424. Accordingly, we find that the Freeds were negligent and uphold respondent's additions to tax on account thereof. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. The sec. 6601 rate of interest with respect to any substantial underpayment attributable to a tax-motivated transaction is 120 percent of the rate otherwise applicable.↩
1. The sec. 6601 rate of interest with respect to any substantial underpayment attributable to a tax-motivated transaction is 120 percent of the rate otherwise applicable.↩
2. 50 percent of the interest due on the amount of the deficiency.↩
1. In her notice of deficiency and pretrial memorandum, respondent challenged petitioners' depreciation deductions not only on the first four above-stated grounds, but also on other grounds, e.g., improper method of depreciation. Respondent has not made those contentions on brief and therefore appears to have abandoned them. Cf. Rule 151(e).↩
2. The Ralion-American Cancer Society lease appears to provide for a reduced rental rate that is a percentage of the rate applicable to the initial 48-month term. It is not clear from the copy in the record, however, what that percentage is.↩
3. Literally, the agreement between Ralion and Soundview provides that Soundview would pay the balance ($ 806,526.38) "by assuming * * * [Ralion's] obligations under the lien" to Lincoln. However, because Ralion's loan from Lincoln was nonrecourse, it seems likely that Soundview merely took subject toLincoln's lien, and did not assume↩ personal liability with respect thereto.
4. Investors' agreements generally were entered into separately by each investor. For convenience, however, we refer to such complementary agreements as a single unit.↩
5. Under the management agreement it was "understood that the Manager [Icon] shall have the sole right and authority to buy, sell, lease, market, remarket or otherwise hypothecate the Equipment and to take such action with respect thereto, that it in its own discretion deems advisable."↩
6. Such notes were to be secured by an appropriate letter of credit and bear interest at the rate of 1 percent in excess of the prime rate announced by Citibank. Such notes were to be payable as follows: $ 25,000 due January 1, 1984; $ 30,000 due January 1, 1985; $ 21,000 due January 1, 1986; and $ 21,000 due January 1, 1987. ICON was authorized to hypothecate or sell those notes if necessary to satisfy the cash-flow needs of the operation. Indeed, ICON's projection of the cash needs of the operation showed a necessity to do so in 1983 (the first year of operation), in order not to have a negative cash flow of almost $ 97,000 in that year.↩
7. It is unclear whether investors themselves entered into these agreements with Soundview, or whether Icon entered into such agreements on investors' behalf. The management agreement states the latter to be the case, but it is petitioners' signatures that appear on the two agreements in the record (and we think it likely that the signature of Scherz appears on the third).↩
8. Recall that ACS' lease was only 48 months, whereas Soundview's was 100 months.↩
9. In the transaction at issue, Riedman received 6 percent to 8 percent of the amount "put up" by investors.↩
10. Beekman also is president of Soundview, which is wholly owned by Icon.↩
11. The ICON forecast confuses Soundview and ACS, referring to ACS as the lessee for the years ended Dec. 31, 1983, through 1991. The ICON forecast predicts that, from 1983 to 1987, net losses of $ 83,704, $ 91,637, $ 88,986, $ 38,986, and $ 34,321, respectively, will be incurred. The ICON forecast predicts "accumulated tax leverage" of 4.65:1, 4.09:1, 3.65:1, 3.27:1, and 3.00:1, respectively, for those years.↩
12. Recall that, under the terms of such agreement, Soundview was to pay investors 75 percent of all amounts received until investors receive $ 108,120; thereafter, Soundview was to pay investors 50 percent of such amounts. The ICON forecast states simply that "Soundview has agreed to pay 75% of the re-let proceeds to the Owner", presumably because the $ 108,120 threshold was not predicted to be reached and therefore was not considered relevant.↩
13. Investors' 75-percent share of annual re-let proceeds would be computed as follows: $ 27,482.67 X 0.75 = $ 20,612.↩
14. The potential for before-tax profit clearly was dependent upon the validity of those assumptions. Accordingly, if petitioners were indifferent as to the latter, they necessarily were indifferent as to the former. The ICON forecast predicts total supplemental rent of $ 61,836, proceeds (to investors) from sale of the equipment in 1991 of $ 52,846, and before-tax cumulative profit of $ 6,791. Thus, the ICON forecast makes clear, and petitioners surely knew, that receiving such supplemental rent and sale proceeds substantially as predicted would be critical to their realizing a before-tax profit.↩
15. In fact, the ICON forecast does not even list↩ the separate pieces of equipment.
16. Further, the fact that both reports were prepared by or on behalf of Icon would tend to cause profit-motivated investors to be somewhat critical of the assumptions and conclusions found therein. See Gilman v. Commissioner, T.C. Memo. 1989-684, vacated as to another issue T.C. Memo. 1990-205, affd. 933 F.2d 143↩ (2d Cir. 1991). Also, the ICON forecast is inconsistent in predicting the same residual value as of both Jan. 1, 1989, and Dec. 31, 1991. Petitioners' apparent failure to discover or seek an explanation for that inconsistency further undercuts their claim to have been seeking a before-tax profit.
17. Icon also agreed to make interest-free, cash-flow loans of no more than $ 14,800 to investors. The value of such loans to investors (the forgone interest), in reality, constitutes a reduction in Icon's fee. That reduction, however, would seem relatively insignificant compared to the fee otherwise owing and therefore will be disregarded.↩
18. Apparently, Icon retained Ralion under a separate remarketing agreement. Another reason cited by Beekman for anticipating ACS to renew the lease was Ralion's purported relationship with ACS. We do not think that that relationship, provided through Icon, can fairly be said to be worth anywhere close to the amounts to be paid under the management agreement.↩
19. We note also that the price investors paid for the equipment ($ 352,308, as compared with a list price of $ 306,355) was defended by petitioners as being reasonable, on account of an increase in value of 10-25 percent's being attributable to a lease with a reputable end-user. Investors, therefore, already had paid approximately $ 46,000 for marketing expenses, and we are not persuaded that in excess of $ 58,800 (less the portion of Icon's fee attributable to record-keeping, check-writing, and similar functions) for remarketing expenses reasonably could have been thought necessary as well.↩
20. We recognize that certain tax benefits are not dependent upon a profit objective. Such tax benefits, however, are not here at issue except as discussed separately below. We do not separately discuss the management and brokerage fees because those expenditures, claimed as deductions under, we presume, secs. 162 or 212, were made without a profit objective and therefore are not deductible, except to the extent provided in sec. 183(b)(2)↩.
21. We discuss interest separately because, for the taxable years at issue, a profit objective is not a prerequisite to deductibility of interest expenses under sec. 163(a). However, for taxable years beginning after Dec. 31, 1986, sec. 163(h)↩ generally disallows deductions for "personal interest" paid or incurred by a noncorporate taxpayer.
22. As noted above, Soundview and Cliftonpark have no common shareholders or officers.↩
23. The Court of Appeals for the Second Circuit's opinion in Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), affg. 44 T.C. 284 (1965), which also involved genuine debt, id. at 738, seems in conflict with their position in Jacobson v. Commissioner, 915 F.2d 832, 840 (2d Cir. 1990), revg. T.C. Memo. 1988-341. "We here decide that Section 163(a) does not 'intend' that taxpayers should be permitted deductions for interest paid on debts that were entered into solely in order to obtain a deduction." Goldstein v. Commissioner, supra↩ at 742. We consider it prudent to follow the Second Circuit's most recent pronouncement.